# The Domestic and Foreign Missionary Society's Appeal.

30   425
151   471
30   425
155   102
30   425
162   581
30   425
184   312
30   425
204   5401
30   425
f218   1166
f218   1167

A legacy to "the Missions and Schools of the Episcopal Church about to be established at or near Port Cresson," upon the western coast of Africa, is a good charitable bequest to the "Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America," by whom the mission at Port Cresson was established, and upon whom it is dependent for support.

In the case of a charitable bequest, it is immaterial how vague, indefinite, and uncertain the objects of the testator's bounty may be, provided there is a discretionary power vested in some one over its application to those objects.

The law regards the substance of the gift; and, in favour of charity, vests it in the party capable of taking it, in whose ease it was given.

A charitable bequest upon a condition not complied with in a reasonable time, will fall into the residue of the testator's estate.

Parol evidence is receivable to show the situation in which the testator stood towards the objects of his charity, and to designate who were intended by the will to be the recipients of his bounty.

APPEAL from the Orphans' Court of *Philadelphia.*

This was an appeal by The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America, from the decree of the Orphans' Court, confirming the report of an auditor appointed to audit, settle, and adjust the accounts of the executors of the estate of Elliott Cresson, deceased, and also to report specially who were the persons entitled to receive each respective legacy under his will, and what amount was to be paid on the same, respectively.

The testator, by a codicil to his will, dated the 7th October 1853, bequeathed as follows:—

"Item.—I give and bequeath to the mission and schools of the Episcopal Church about to be established at or near Port Cresson, the sum of five thousand dollars; in the disbursement of which, as well as in the application of the fund bequeathed to the seminary near Alexandria, I desire and direct that the pastor of the church of St. Andrews, for the time being, shall enjoy a full and equal voice. Should a collegiate department for the benefit of the natives and citizens be added to the mission and schools aforesaid, I hereby add a further sum of five thousand dollars."

The auditor reported upon this bequest as follows:—

"The legacy was not claimed directly by or in behalf of the 'mission and schools' themselves, but by 'The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America,' a corporation created by the state of New York, May 13th 1846, and having its chief place of business in the city of New York. With reference to the last clause

of the legacy, it was asked by the claimant that the money should be held and retained by the executors for a reasonable time to await the establishment of a collegiate department, or in default of such order being made, that it should be awarded to the claimant above named, subject to a right of recovery by the executors, in case the establishment of the collegiate department were delayed an unreasonable length of time, under all the circumstances.

" In connexion with this claim several witnesses were examined, under objections by the counsel for the executors and the residuary legatees, viz.: Rev. Samuel D. Dennison, Rev. William Wright, Rev. William Bacon Stevens, D. D., and William Coppinger, one of the executors. The principal material facts testified to by them were as follows :—

" By an act of the legislature of the state of New York, passed May 13th 1846, all such persons as then were or might thereafter become members of ' The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America,' were constituted a body corporate, by the style of ' The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America,' for the purpose of conducting general missionary operations in all lands. A committee of this body, styled ' The Foreign Committee,' has charge of the foreign missionary operations; and another committee, styled ' The Domestic Committee,' has charge of the domestic missionary operations. The expenses of foreign missions and schools are paid out of the treasury of the Foreign Committee; and the committee seems to be the executive organ of the corporation in the actual direction and control of the missions and schools. The seat or location of the committee is in the city of New York, and its business is transacted there.

" For about the last twenty years, it appears that the original society, or the present corporation, has established or continued missions and mission schools, and sustained missionaries, on the western coast of Africa; and it is alleged in behalf of the claimant, that during the fall of the year 1853, probably about October or November, a mission and school were established by the corporation above named, acting through its foreign committee, at or near the place meant and intended by the testator as Port Cresson.

" There does not appear to be any determinate geographical locality now known as Port Cresson, and there is some confusion as to the applicability of that designation. Mr. Coppinger, one of the executors, testified that, in 1834, a portion of territory on the western coast of Africa, known as Bassa Cove, and within the state of Liberia, was purchased by the action of the Young Men's Colonization Society of Pennsylvania, the testator contributing one thousand dollars for that purpose, and that the American

[The Domestic and Foreign Missionary Society's Appeal.]

settlers, upon their arrival thereat, resolved to call their town Cresson. The coast at Bassa Cove is indented, and forms a sort of harbour, into which the river St. John's empties. At the mouth of the river is the native village of Bassa. The harbour is called Bassa Cove, the main land around it is called the Bassa Country, and the natives are called the Bassa people. The coast runs north-west and south-east. At the south-eastern end of the cove, on the ocean, is a town or settlement called Fishtown. At the north-western end, on the St. John's river, which there empties into the ocean, is the site of the native village of Bassa, called by some of the witnesses Buchanan, having a population of 400 or 500, all black, except a missionary and his wife.

"In 1835, as Mr. Coppinger testifies, the above-mentioned town of Cresson, or Port Cresson, was attacked by the natives, and the settlers were driven off. There is no evidence as to a rebuilding of the town. Some years subsequently, in 1849, the Pennsylvania Colonization Society, by resolution, recommended the authorities of Liberia to re-establish the old town, and to name the new town as established, Cresson, in honour of the testator. These resolutions, it is said, were communicated to Liberia, and at a public meeting of the citizens of Bassa county, the recommendation of the Pennsylvania Society was approved, and it was resolved to call the new town, Cresson. But this does not appear to have been carried into effect, as the proposed action was superseded by the proceedings of the legislature of Liberia, which, at a session commencing in December 1851, by charter, constituted a new city on the western coast of Africa, extending from the mouth of St. John's river south-eastwardly to a point of rocks running out into the ocean, being about five miles in extent, along the sea coast. This new city was called Buchanan, after one of the governors of the colony, and it included, within its territorial limits, the locality of the former town of Cresson. In December 1853, the legislature of Liberia gave the name of Port Cresson to an anchorage formed by the ledge of rocks, which was the south-eastern terminus of the charter limits of Buchanan, and which lay in front of the old town of Cresson.

"It may be remarked, that some of the witnesses apply or limit the designation Buchanan to the settlement formerly called Bassa, at the mouth of the St. John's river, probably because the buildings are chiefly about that point, or from an impression that the name is applicable only to that locality. For instance, Mr. Wright says, 'I do not know that there are any mission buildings at or near Buchanan; the mission buildings of the Protestant Episcopal Church are nearly a mile south of Buchanan; the mission buildings are between Buchanan and Fishtown.' Here he is evidently taking Bassa to be Buchanan; and he speaks in another place of Buchanan being 'situated a little way in from the mouth of the

river;' whereas the mission buildings are within the corporate limits of the city of Buchanan, and those limits extend for five miles along the coast, including both Bassa and Fishtown.

"Although the mission buildings may, in one sense, be considered near the site of the old town of Cresson, or Port Cresson, yet they are not shown by the evidence to be at that site. It would seem, however, that the name Port Cresson was not in usage limited to the exact site of the old town, but extended to the circumjacent territory.

"There is express parol evidence of the sense in which the testator used the term Port Cresson. The Rev. William Bacon Stevens says, 'he (the testator) always spoke of it as Bassa Cove or Port Cresson, using the terms interchangeably to designate the general district of country,' and to Mr. Coppinger he said, after the former had perused the will, 'that what others chose to call Buchanan, Bassa Cove, or anything else on the coast of Africa, he chose to call Port Cresson, as that was the proper name for it.' Regarding, therefore, the signification in which the testator is thus shown to have used the term Port Cresson, we must consider it as applicable not only to the locality of the former town of Port Cresson, but as extending to the surrounding region, that is, the Bassa country, or the district around or upon the Cove.

"The next inquiry is as to the establishment of a 'mission and schools at or near Port Cresson.' The Rev. S. D. Dennison, Secretary and General Agent of the Foreign Committee above mentioned, says that a mission and schools of the Protestant Episcopal Church have been established at Port Cresson within the last two years, or about October or November 1853; but he states also that Mr. Rambo, the missionary in charge thereof, went from Cape Palmas to Buchanan, about March 1855, and that, prior to Mr. Rambo's going to Buchanan, there was no mission of the Protestant Episcopal Church there, that the witness knew of, nor does the witness show by what particular acts or proceedings the establishment of the mission took place, if at all, before Mr. Rambo's arrival at Buchanan. Dr. Stevens gives 1851 or 1852 as the time, when, according to his impression, the mission was finally established. Mr. Dennison does not give any very definite location to Port Cresson. He does not know that there is in his office any correspondence with any missionary at a place called Port Cresson, nor has he seen any such place on the maps, nor has any mission or school been established by the name of Port Cresson. He states that the Rev. Jacob Rambo, a missionary of the Protestant Episcopal Church, is stationed at Bassa, which we have seen is north-west of the site of the former town of Port Cresson. This witness does not seem to be aware of the corporate limits of the city of Buchanan, as stated by Mr. Coppinger. He considers Port Cresson and Buchanan as equivalent expressions,

and by the latter term he evidently understands the village of Bassa, for he refers it to the seat of Mr. Rambo's operations, which is at Bassa.   He further says, 'I don't know whether the schools have been commenced or not; a building or buildings have been erected for the accommodation of the schools;' the latter fact he knows only 'from information from others, and from correspondence.'   He states also that there is a written record of the establishment of a mission or schools at Buchanan, which he can produce, but he does not do so.   It is to be regretted that he has not furnished the more satisfactory evidence, which appears to be within his power, of the action and proceedings of the society or the committee in New York, in connexion with the establishment of the mission and schools, so that we may be enabled to ascertain with precision and accuracy what particular steps have been taken in that behalf.   Mr. Dennison does not say, nor does any other witness, that a collegiate department proper has been added to the mission and schools; indeed such an undertaking would, under the circumstances, be altogether premature.

"The Rev. William Wright, another witness, was at Bassa for three or four days, in the year 1855.   He does not know that there are any mission buildings at or near Buchanan, and says the mission buildings there, in progress of erection, are nearly a mile south of Buchanan.   Here he is evidently applying the designation Buchanan to the settlement called Bassa, at the mouth of the St. John's, and not to the entire corporate limits of the city of Buchanan.   He was not at the mission buildings, but saw them from the deck of the vessel he was on.   They were between Buchanan and Fishtown.   The outbuildings were finished, and the main building was in progress of erection.   Mr. Rambo was at Buchanan, engaged in organizing a school, but had not one under his charge.   He mentions two lads, one a native, the other a colonist, who were to be pupils in the school; but there was no school organized and in practical operation.

"Dr. Stevens and Mr. Coppinger both testify to a strong interest which the testator manifested in this mission, and to collections and gifts made by him in its behalf.

"It is believed, that parol evidence is admissible to show that the testator used the term Port Cresson without any very precise limitation, but as extending to the general region of country; in this sense, therefore, the mission and schools spoken of by these witnesses, so far as they are to be taken as established, are to be regarded as established at or near Port Cresson; but the evidence is not very explicit in disclosing with exactness and definiteness the particular steps taken in establishing or founding the mission and schools, or the circumstances, manner, terms, or conditions of the foundation, or in identifying the particular mission and schools, as the very mission and schools which were about to be

established in October 1853, the date of the codicil, or on February 20th 1854, the date of the probate; or in showing on the other hand that this particular mission and the schools comprise the entire and complete mission and schools which were about to be established, or that the point at which they are located is the only one within the general region known as the Bassa country or Port Cresson, in which it was intended to establish a mission or schools.

"An argument was, however, directed against the language of the legacy itself. It was alleged, that the description of the objects of the testator's bounty, is defective in those elements of legal certainty which must exist in such bequests to religious or charitable uses. Who are the persons that are to take under the description of 'mission and schools?' What people are individualized and identified as those having a fixed legal interest in the legacy? What constitutes 'a mission?' It is said that the term mission signifies a sending forth, and, therefore, has relation to a superior body, at whose instance the sending forth takes place. But the word, in that sense, denotes a mere act.

"The testator has probably used the word in a more concrete sense, to denote the persons sent, considered in connexion with the purpose of their going, or as denoting the place whither they are sent, both of which are recognised by lexicographers as proper significations of the term. This appears to be confirmed by the language used here; for in the same clause, the testator speaks of it as a thing capable of receiving the addition of a collegiate department; and his legacy is given directly to the mission and schools, which seems to presuppose a capacity in themselves to take; and if the mission and schools were deemed by him capable themselves of taking, it would seem more natural to suppose that it was with them, and not with a distinct corporate body in New York, not named in the will, that the pastor of St. Andrew's Church for the time being, was to enjoy a full and equal voice in the disbursement of the fund. The persons composing the mission establishment, when Mr. Wright was there, were Mr. Rambo and his wife, a young man taking care of the mission buildings, two lads, one a colonist, the other a native, and also a colored person, whose wife was the cook.

"If by 'mission' is to be understood those composing the mission family, and conducting the missionary operations, are all of those persons to take, and if not, which of them; or are others to be included who may hereafter be joined to the same station? And, again, what persons are to take as constituting the 'schools?' In what relative proportion are the mission and the schools to take, and how many schools may take, and may those which may be established hereafter become interested in the fund? Are the present mission and schools entitled as first takers to the corpus of the legacy absolutely, or is it charged with a trust in

favour of their successors; and if so, what element of perpetuity is there in them which would be a vehicle for transmitting to others its benefits? Such inquiries as these were pressed with great force by the counsel for the executors and for residuary legatees. It will be observed, that neither is the mission nor are the schools incorporated; and it can, in fact, scarcely be said that, like the ordinary charitable and religious associations, they have a substantive self-existent or self-dependent being, and an organization of their own; for they are carried on or constituted by missionaries, as agents or delegates, employed (as the missionaries at least are) at an annual salary by a corporation of the state of New York, by whom they are liable to be changed at any time, or withdrawn altogether; and the mission and schools thus become abandoned.

"It is true, that a trustee may be supplied to sustain a trust, but still the *cestuis que trust* must be capable of ascertainment and identification, so that they may be recognised, and may have a legal *status* in asserting their rights as *cestuis que trust*.

"It is believed, that parol evidence is admissible to show that by the expression 'the Episcopal Church,' the testator intended 'the Protestant Episcopal Church;' that not being an ambiguity arising on the language of the will, but an uncertainty created by extrinsic facts or circumstances; but this rule can hardly be extended to the admission of evidence, that when the testator, by language carrying no uncertainty in this respect upon its face, has named the 'mission and schools' as his legatees, he intended somebody else, to wit, a corporation styled 'The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America.' That would be putting other words in the will; and the case is not one of a defective attempt to designate that corporation, but one relative to the legal certainty and capacity of the legatee who is designated.

"But were the difficulties, or at least the embarrassments above alluded to, all removed; were the mission and schools considered to be established and identified, and to be capable of taking; and were the legacy treated as sustainable in all respects, under the liberal doctrines administered in Pennsylvania, relative to charitable bequests, still it is not easy to see an answer to another view pressed by counsel, which was, that the auditor had no power to dispose completely, practically, and effectually of this matter in the present reference.

"The auditor was appointed to audit and settle the account of the executors, and to report who are the persons entitled to receive each respective legacy under the will. 'The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America,' an ecclesiastical corporation created by another state, appeared and claimed that a legacy to

[The Domestic and Foreign Missionary Society's Appeal.]

certain missions and schools should be paid to it in trust for said missions and schools, the claimant not being itself named in the will. It seems to the auditor, that if that corporation, not being the legatee in its own right under the will, is entitled to be constituted a trustee for the legatee named in the will, that right should, under the present circumstances, be judicially established upon bill or petition filed, or by some other legal proceeding directly had in that behalf, in a proper forum, before the auditor would be justified in directing, or the executors in making, payment to it. The auditor is of opinion, that he has no authority, as auditor, to constitute the claimant a trustee, or to declare the trust, or establish its terms, or define the mode of its execution, or determine the amount or nature of the security, if any, which should be given, or the time and place of the settlement of its accounts. The mission and schools have not appeared and claimed payment to themselves in their own right and behalf, and the claimant is not the legatee, but is a stranger to the will, and is not therein or thereby constituted a trustee for the legatee. The exigency of the case as it stands at present, is, therefore, believed to be met by reporting, without prejudice to any future or other proceeding on the part of the claimant in this behalf, that the legatees named in the will have themselves made no claim to the legacy in question, and that 'The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States of America,' has shown no legal right or authority to receive the legacy as trustee for the 'mission and schools.' "

To this report exceptions were filed by The Domestic and Foreign Missionary Society, which, after argument, were dismissed by the Orphans' Court, and the report of the auditor was confirmed. From this decree the present appeal was taken.

*Olmsted* and *G. M. Wharton*, for the appellants.—The decisions of the courts of Pennsylvania have uniformly been to guard against the failure of charities: Witman *v.* Lex, 17 *S. & R.* 93; Vidal *v.* Philadelphia, 2 *How.* 127; Magill *v.* Brown, *Brightly* 347, 386, 387, 410; Town of Paulet *v.* Clark, 9 *Cranch* 328–9. The court will ascertain the actual intent of the testator, and give it effect; and this, even notwithstanding the literal meaning of the words: McGirr *v.* Aaron, 1 *Penn. R.* 49; Newell's Appeal, 12 *Harris* 197. A corporation of a sister state may take land in this state, by gift or devise, to be expended for a charitable use.

*St. G. T. Campbell* and *Parsons*, for the residuary legatees.— The facts and the law applicable to this case, are accurately stated in the report of the auditor; and upon them the appellees will rely; and maintain: 1. That the appellants are not the parties

entitled to the fund. 2. That there has not appeared, nor does there now exist, any party, to whom the bounty of the testator was directed.

The opinion of the court was delivered by

STRONG, J.—This appeal raises two principal questions. They are, whether the testator's will sufficiently defines the objects of his intended bounty, and whether, if it does, the legacy can be decreed to the appellants.

The clause in the codicil to the will, out of which the questions arise, is as follows: "I give and bequeath to the mission and schools of the Episcopal Church about to be established at or near Port Cresson, the sum of $5000; in the disbursement of which, as well as in the application of the fund bequeathed to the seminary near Alexandria, I desire and direct that the pastor of the church of St. Andrew's for the time being, shall enjoy a full and equal voice. Should a collegiate department for the benefit of the natives be added to the mission and schools aforesaid, I hereby add a further sum of $5000."

This codicil was made October 7th 1853. The testator was a resident of Philadelphia, and a worshipper in St. Andrew's Episcopal Church, of which the Rev. Dr. Stevens was pastor. Port Cresson is a place upon the western coast of Africa, named in honour of the testator; often called by other names, but known by Mr. Cresson, and spoken of by him, under that name. In the immediate vicinity of this place, the Domestic and Foreign Missionary Society, the appellants, established a mission about the time when the testator made his testamentary disposition. Their purpose to establish the mission there, was known by him at the time, and met his approbation. There was not then, nor is there yet, any other mission or school of the Episcopal Church in that vicinity.

Looking now at the bequest from this stand point, the one which Mr. Cresson occupied when he made his codicil, it cannot be doubted that he intended as the objects of his bounty, the identical "mission and schools" thus established by the appellants, who were then the sole agents of the Episcopal Church in establishing missions. Nor can it be doubted that the words of the codicil express that intention. So the auditor has reported, after having properly called to his aid parol evidence to show the situation in which the testator stood when he made the bequest under consideration. That such evidence is admissible in aid of the interpretation of a will was ruled in Marshall's Appeal, 2 *Barr* 388, in Brownfield *v.* Brownfield, 8 *Harris* 55, and in Rewalt *v.* Ulrich, 11 *Harris* 391.

It may be remarked, that the legacy is a bequest to a religious and charitable use. Such gifts have always been pre-eminently

[The Domestic and Foreign Missionary Society's Appeal.]

favoured in Pennsylvania. The British statutes of mortmain were never in force here, and though the statute of 43d Elizabeth has not been re-enacted, yet its spirit has been fully recognised in judicial decision. No better illustration is needed of the extent to which the law of Pennsylvania has gone in sustaining chari-·table bequests, than is found in the language of this court in Witman *v.* Lex, 17 *S. & R.* 93, where it was said, "it is immaterial whether the person to take be *in esse* or not, or whether the legatee were, at the time of making the bequest, a corporation capable of taking or not, or how uncertain the objects may be, provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects, or whether their corporate designation has been mistaken. If the intention sufficiently appears on the bequest, it would be held valid." By a rule peculiar to gifts of this nature, the charitable purpose of the donor will be carried into effect, notwithstanding the indefiniteness of its immediate objects: 1 *Jarman on Wills* 216. The learning upon this subject has been exhausted by the late Judge BALDWIN, in his opinion upon Sarah Zane's will: McGill *v.* Brown, *Brightly's Rep.* 347.

When it is remembered, that this legacy to the "mission and schools of the Episcopal Church" is a charitable bequest, it certainly cannot be successfully contended that it is void because it does not sufficiently designate the persons for whom the testator intended the beneficial use of the $5000. In such gifts beneficiaries have been held to be sufficiently described in numerous cases still more indefinite. They have been sustained in England in the following cases among others: a gift to the poor in general, 2 *Lev.* 167, *Finch* 245; a bequest for the advancement of religion, 1 *Mol.* 616; a gift to such charitable uses as A. shall appoint, 1 *Vesey Jr.* 464, 7 *Vesey* 36; a bequest to a particular charity by a description equally applicable to two, and it is wholly uncertain which was intended, 1 *P. Wms.* 674, 5 *Russ.* 112. These, and numerous other cases of a similar character are collected by Mr. Jarman. They are all cases in which, as ordinary testamentary dispositions, the legacies would be held void, but as charities they are valid.

Our American books are equally full of similar adjudications. In 2 *Peters* 578, land marked in the plan of a town "for the Lutheran Church," for religious purposes, was held a good charity, without any other description of donees or uses. In Witman *v.* Lex, 17 *S. & R.* 88, a legacy was given to "the poor of the Lutheran congregation." It was held good. In the same case, a legacy, the interest of which was to be applied from time to time to the education of young men in the ministry of a congregation, under the direction of the vestry, was sustained. So, a bequest "for the relief of the indigent, blind, and lame, giving a prefer-

ence to those resident in Philadelphia and its neighbourhood," 3 *Rawle* 170, was held valid. So also, in Pickering *v.* Shotwell, 10 *Barr* 23, a devise to an unincorporated religious society, "to be applied as a fund for the distribution of good books among poor people in the back parts of Pennsylvania, or to the support of an institution or free school, in or near Philadelphia," was maintained as a good, charitable gift: 9 *Cranch* 296; 3 *Peters* 99; McGill *v.* Brown, *ut supra.*

A gift to a particular "mission and schools" is equally definite, so far as relates to the beneficiaries. The word "mission" is well understood in common language. For more than forty years, the different American churches have been engaged in establishing and maintaining missions in various parts of the heathen world. Hardly a religious denomination exists which is not employed in one or more of such benevolent enterprises. The purpose is to civilize, christianize, and educate the natives of those countries where the missions are established. This is accomplished by preaching, by oral instruction, and by schools. In the work, persons sent out by the churches in this country, as well as native assistants, are employed, and they are supported and controlled by the churches at home. The whole machinery of the work at the selected spot in a foreign land is called a mission. It is, in fine, a Christian school. Surely, if a bequest to a school, a church, or to the poor of a parish, is sufficiently definite, a legacy to a mission is equally so. In neither case can it be said, that a particular person, apart from all others, was intended by the testator to be a beneficiary. A court can know the class, but individual designation is left to the trustee, who is the dispenser of the bounty, and who is under obligation to dispense within the class. The general rule may be stated thus:—In the case of a will making a charitable bequest, it is immaterial how vague, indefinite, and uncertain the objects of the testator's bounty may be, provided there is a discretionary power vested in some one over its application to those objects: Witman *v.* Lex, 17 *S. & R.* 91; Beaver *v.* Filson, 8 *Barr* 327; Pickering *v.* Shotwell, 10 *Barr* 23; Martin *v.* McCord, 5 *Watts* 493.

Nor, if there be such discretionary power anywhere, will the legacy fail for want of a trustee capable of taking it. But by the express directions of this will, a discretionary power over the disbursement of the legacy is given to the pastor of the church of St. Andrew's for the time being. That pastor was the Rev. Dr. Stevens. To him is given a full and equal voice in its disposition. The bequest, therefore, must be held to be valid. It may, in this connexion, be remarked, that the expression "full and equal voice" implies the existence of an intention in the testator that some other person than the pastor of St. Andrew's should direct in the disbursement.

[The Domestic and Foreign Missionary Society's Appeal.]

We proceed now to inquire whether the appellants are entitled to receive the legacy. They are capable of taking, and they are the hand of the Episcopal Church to establish, control, and sustain all its missions. The mission at or near Port Cresson is their creature, wholly dependent upon them for sustenance as well as existence. Separated from them, it has no being as a mission. They disburse whatever is appropriated to the mission and schools. A legacy to the "mission and schools" is a gift in their ease. It must be presumed to have been intended as such by the testator; as a bequest in relief of the general funds of the society. Whatever the "mission and schools" may receive from the testator's estate, diminishes the necessity of disbursements from the general treasury of the society. In McGirr v. Aaron, 1 *Penn. R.* 49, there was a devise to a Roman Catholic priest to be entailed to him and his successors, to be transmitted to his successors for ever, in trust to say masses. This court held, that though the devise was literally to the priest and his successors, and as such would have been void as tending to create a perpetuity, yet that its actual intent was to be for the maintenance of a priest, *in ease of the congregation*, and consequently for its benefit alone. The congregation was therefore held entitled to take the profits in the first instance, but subject to a right in the priest to have them applied to his support. And this, though the congregation was not named in the will. Similar adjudications have often been made, when the object literally designated has been incapable of taking directly, and the legacy has been in relief of a superior: 2 *Plowd.* 523; *Perk.* 509; 1 *Atk.* 436. A bequest to a school has been held to be a gift to a schoolmaster; one to a church, a gift to the parson and his successors; one to parishioners, a gift to churchwardens: 11 Hen. IV. 84 b; 37 Hen. VI. 30; 9 *Cranch* 292. So in the case of The Mayor of Reading v. Lane, *Toth.* 7 (cited by Judge GIBSON, 17 *S. & R.* 91), where a devise was made to the poor people in the hospital of St. Leonard's, it was decreed, that as the plaintiffs governed the hospital, the land should be assured to them for the use declared in the will.

The law regards the substance of the gift, and in favour of charity vests it in the party capable of taking it, in whose ease it was given, 9 *Cranch* 329; the object being to effectuate the intent of the testator, rather than let it fail. It is true, the doctrine of *cy pres* is not fully adopted in this state. It is not necessary to resort to it. The cases above cited were not decided upon that principle. They rest upon the basis of a fulfilment of the direct purpose of the donor. They are not judicial appointments of trustees to prevent the failure of a trust.

The views we have expressed lead directly to the conclusion that the appellants, being " The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States

of America," are legitimate claimants under the will of Mr. Cresson to the legacy of five thousand dollars. The additional bequest of a similar amount was given upon a condition which has not been complied with, although a reasonable time has elapsed since the establishment of the mission. That, therefore, will fall into the residue of the estate.

It follows also, that the auditor was not called upon to constitute a trustee, or declare a trust. That had already been sufficiently done in the will. He made a distribution of the whole estate, and the Orphans' Court confirmed that distribution.

We merely add, that the parol evidence submitted to the auditor appears to us to have been properly received. Its purpose was to show that there was in being such an object as the testator designated in his will.

> The decree of the Orphans' Court of Philadelphia, confirming the report of the auditor, is reversed, and it is ordered, adjudged, and decreed, that the distribution made by the auditor be corrected, by allowing to The Domestic and Foreign Missionary Society of the Protestant Episcopal church of the United States of America, the legacy of five thousand dollars, in trust for the mission and schools of the Episcopal Church, at or near Port Cresson, in the disbursement of which the Rev. W. B. Stevens shall have a full and equal voice. And it is further ordered, that subject to the foregoing correction, the report of the auditor be confirmed. And that the appellees pay the costs of this appeal.