WARDENS AND VESTRY OF ST. PAUL'S CHURCH *vs.* ATTORNEY GENERAL & others.

Suffolk.    March 21, 22, 1894. — July 16, 1895.

Present: HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Trust Deed — Perpetuity — Gift to Trust Fund — Valid Public Charity — Right of Reverter in Founder of Trust — Effect of Deed on Trust created by previous Deed — Express Trust — " Nearest Heir " and " Eldest Lineal Male Descendant " — Accumulation for Benefit of a Charity — Bill in Equity.*

Where a grantor, by the terms of a trust deed, confers upon the grantees discretion to apply one half of the income either to the accumulation of the fund, one half of the income of which is intended for the benefit of the grantor or his descendants, or to apply it to charitable or pious uses, there is as to one half of the fund

a valid charitable trust, subject to an illegal discretion as to accumulation for the benefit of the grantor or his descendants which will be rejected; and as to the other half of the fund, an invalid trust being created, the beneficial interest results to the donor; and other trust deeds not delivered to the grantees until after the delivery to and acceptance by them of the first deed cannot affect the interpretation of the first deed, or make the invalid trust valid.

If a grantor makes a gift of a certain sum of money, to be appropriated for the foundation of a trust fund established by him by deed nearly two years previous thereto for charitable uses, and the gift is formally accepted by the grantees as a " donation . . . towards a fund for charitable uses," the gift becomes a part of the fund, and is subject with it to the legal interpretation of this court.

A gift to a library, which first mentions a limited and definite class of beneficiaries, but finally provides that the library is to be used by the public generally, creates a valid charitable trust.

A deed does not convey or purport to convey any right of reverter remaining in the founder of a trust, if such appears to be the intention from the construction of the language of the deed as a whole.

While the effect of a deed cannot alter a charitable trust created by the grantor by another deed executed more than thirty years before, yet if the intention is clear it may operate as a release as to matters of account prior to its date, and from the obligation voluntarily entered into by the trustees, in their discretion, by a former deed, to expend a certain part of the income of the original fund for the purchase of books for a library; and, released from such obligation, the trustees are free to apply the income to objects of charity, in their discretion, according to the original deed of trust.

Where the possession of property is held by a trustee, not by virtue of any personal right or personally asserted right on his part, but is colored by a trust and confidence in virtue of which he received it, the identity of the *cestui que trust* is of very little importance, but the relationship is all important; and, so long as the relation of trust exists, it is a case of express trust, no matter who the *cestui que trust* may prove to be.

S. provided by will that the beneficiary income of a trust fund established by him many years before by deed, which income was to be paid over to " S. or his nearest heir by the name of S. for the time being who shall demand it," should be, when demanded, " the sole property of my heirs having the right to receive the same successively, as described in said trusts." By a later article he gave the residue of his estate in trust, and by another article provided that in the will and wherever else he had used the like terms, " nearest heir " and " eldest lineal male descendant " should mean first his son S., Jr., and his male issue successively, in order of seniority, *in infinitum*. *Held*, that the deed could not be construed to mean that S., Jr. took an estate for life with remainder over, and that the question was unimportant, as he had received the income during life with the acquiescence of all parties; that his eldest son, who was living, was not entitled to a life estate before the beneficial interest under the trust failed and became vested in those entitled to it, and that this interest, the trust being void for remoteness, vested in the trustees under the residuary clause, notwithstanding that the testator in this clause excepted from the residue " any of the trust funds by me created during my life, or the incomes thereof, which are to be disposed of according to the trusts declared concerning the same, without reference to this item."

The limits of an accumulation for the benefit of a charity are subject to the order of a court of equity, and to justify such equitable interference the accumulation should be unreasonable, unnecessary, and to the public injury.

*On a bill in equity for instructions as to the interpretation of a deed of trust, questions will not be considered if enough does not appear in the bill to enable the court to pass upon them.*

LATHROP, J.    This is a bill in equity, filed on August 7, 1891, to obtain the instructions of the court in relation to certain trusts created by David Sears.    The defendants are the Attorney General of the Commonwealth, the Proprietors of St. Paul's Church in Boston, the surviving executor of the will of David Sears, the trustees under his will, his eldest grandson, his heirs at law, and Trinity Church.

On March 1, 1821, David Sears conveyed, by six separate deeds, six pews in St. Paul's Church in Boston to the Wardens and Vestry of said church, and their successors in office, in trust to lease the pews and invest the rents thereof to form a permanent fund.    The deeds then provided as follows: "And the said Wardens and Vestry and their successors in office shall make a statement of said fund, and of the income thereof, and shall pay over to said Sears, or his nearest heir by the name of Sears for the time being who shall demand it, the one half of said income for his or her use and benefit, that is to say, any heir of said Sears, of his name, who may demand the said one half of said income, shall be entitled to receive it, but his or her right to it shall be superseded and annulled whenever a nearer heir of the same name shall make a similar demand.    And provided neither said Sears nor any of his heirs as above, nor any person authorized by him or them, shall demand said income, within six months after it shall have been due and paid over to said Wardens and Vestry, then the said Wardens and Vestry shall invest said income in stocks, etc., as above, to increase and accumulate the fund aforesaid.    And the remaining half of said income arising from said fund as aforesaid, the said Wardens and Vestry shall either invest in stock, etc., as above, to increase and accumulate the fund aforesaid, or shall and may expend from time to time on any charitable or benevolent object or objects, in such manner and under such regulations as to their wisdom may seem advisable.    It being the intention of said Sears to give to said Wardens and Vestry and their successors in office the uncontrolled liberty of appropriating from time to time the remaining half part of said income from said fund."

On March 5, 1821, this gift was formally accepted by the plaintiffs as a gift "in trust for charitable uses."   At some time previously to November 12, 1822, Mr. Sears delivered to the plaintiffs a deed (known as the "deed in the parchment envelope"), bearing date March 1, 1821.   By this deed he assigned to the plaintiffs for the term of nineteen years, (or for his life should he not live so long,) all his right, title, and interest to his half part of the income arising from the fund by this deed, and by the deeds of the pews, to be expended for sacred music.   The previous deeds were referred to as deeds "in trust to form a fund for charitable and other uses."   It was further declared that this deed and the previous deeds were to be operative only on the condition that the plaintiffs should be governed by the definition of the phrase "nearest heir" set out in this deed.   This definition was, in general, to the effect that the eldest of male descendants should be preferred.   This deed was formally accepted by the plaintiffs on January 13, 1823.

On November 9, 1822, Mr. Sears made a gift of one hundred dollars, to be appropriated for the foundation of the trust fund established on March 1, 1821, by the deed just referred to.   This was formally accepted on November 18, 1822, by the plaintiffs, as a "donation . . . towards a fund for charitable uses."

Up to January 1, 1824, one half of the income of the trust fund was expended in sacred music, and the other half expended for charitable objects, or accumulated.

On January 1, 1824, Mr. Sears conveyed a parcel of land adjoining the church to the plaintiffs as actuaries of the Sears fund, "subject to its conditions, limitations, and restrictions," namely, that one half of the income of the fund should be paid "over to the parties being issue of said Sears," as before designated, "and provided, if at any time hereafter it should so happen, from any cause whatever, that said income cannot be so paid over, or that any of said parties should in any way be prevented, excluded, or prohibited, or should in any manner be debarred, from their several successive rights, or if any of said parties, as they may become successively entitled to said income from said fund and said account of said fund, should not receive the same within one year after demand thereof," then the whole fund should "be immediately forfeited to, revert to,

and be reinvested in" David Sears and his heirs. Power was given to the Wardens and Vestry to exchange or sell the lot of land, if it should be found advantageous or expedient, "provided always that the proceeds of such exchange or sale shall be reinvested in real estate for the use and benefit of said fund." The deed further stated that the Wardens and Vestry by their acceptance declared " that the above are the terms, conditions, limitations, and restrictions and tenure " of the said fund as understood by them in addition to and in explanation of the previous deeds; and that the Wardens and Vestry by their acceptance promised that half of the "remainder of said income" should be invested in buying books for a library to be open to the proprietors of the church, to all clergymen, men of letters, and members of government, and to be used by the public generally under such rules as might be deemed expedient, " the said Wardens and Vestry reserving the other half part of said remainder of said income to be appropriated " as expressed and authorized in the former deeds.

From January 1, 1824, to February 27, 1854, the plaintiffs received the rents from the pews, and invested the same as part of the trust fund. One half of the income thereof was, in accordance with the provisions of the deed of March 1, 1821, expended for sacred music until 1840, and thereafter it was added, by the direction of David Sears, as an accumulation to the trust fund. One quarter part of said income was expended in the purchase of books for the library, in accordance with the provisions of the deed of January 1, 1824; the remaining quarter part of said income was expended by the plaintiffs for charitable objects, or added by them as an accumulation to the fund.

On May 1, 1843, David Sears executed and delivered a deed, witnessed and recorded, by which he, for himself and his heirs, " having a right of forfeiture," purported to assign to Trinity Church in Boston, or in certain contingencies to the Protestant Episcopal churches in Boston, " the contingent and conditional interest" in the fund and the real estate. The provisions of this deed will be more fully stated later.

On May 10, 1847, David Sears, by a letter to the Wardens and Vestry of St. Paul's Church, released them from any obligation to appropriate one quarter part of the income to the purchase of books for the " public library," and authorized them to

appropriate to such purpose so much only of the income as they might deem judicious, and to apply the remainder of such part of the income in their judgment to any honorable purpose.   This letter also contained a reiteration of the trust, and approved the accounts of the plaintiffs.   It does not appear that this letter was acted on by the plaintiffs, except to request a deed of confirmation.

On February 25, 1854, David Sears executed, and on February 27 acknowledged and delivered, a deed to the Wardens and Vestry in confirmation of this letter.   After reciting the letter, the trusts, etc., the grantor gave certain directions as to the management of the fund, and authorized the Wardens and Vestry to expend the one half part of the income of the fund, in "their discretion, in such objects of utility, benevolence, or expediency as they in their judgment may from time to time see fit for the benefit of the church"; discharging them from the obligation of investing one quarter part of the income in books, and from all responsibility as to errors, omissions, etc. as to past acts and appropriations, with the proviso that the grantees were entitled to one half part of the income on the condition that they paid over the other half of said income to David Sears and his heirs who may demand the same, according to the provisions of the deed dated March 1, 1821, and delivered at some time before November 12, 1822; if not demanded to be accumulated according to the terms of the trust.   The deed further authorized " the use of the hall originally intended for the library in the vestry building" for any purpose the Wardens and Vestry should see fit.   The deed closed by declaring that it was to be regarded as affirmative only, and that nothing therein contained was to be so construed as to alter or diminish in any degree the rights reserved to the donor and his heirs by the original deeds, nor the tenure of the trust, nor the claims of the parties to his benefits hereafter.

From February 27, 1854, to the present time, the plaintiffs have continued to receive and invest the pew rents as a part of the trust fund.   No income has ever been received from the real estate.   Up to April, 1860, one half the income of the fund was accumulated, as no demand was made for it by David Sears.   On that date, a demand having been made by him, and thereafter

13

until his death on January 14, 1871, the said one half part of the income was paid to him.   In 1871 and 1872 that half of the income was paid over to David Sears, Jr., the eldest son of David Sears, the founder of the fund.   Since the death of David Sears, Jr., early in the year 1873, this half of the income has been accumulated as a separate fund due the Sears family, at the request, oral and written, of one Cotting, acting for the Sears family.   On June 9, 1893, a formal demand was made on the plaintiffs by said Cotting, in behalf of the trustees under the will of David Sears, and of the heirs and next of kin of said Sears, or any of them entitled, for the payment of all said one half of the income of the trust fund heretofore received by the plaintiffs, or hereafter to be received by them.

The other one half part of the income of said trust fund has been expended by the plaintiffs, from said February 27, 1854, to the present time, for objects of utility, benevolence, or expediency, for the benefit of St. Paul's Church.   No part of the income during said period, except a payment in March, 1854, has been expended for the purchase of books.

David Sears by his will devised his residuary real and personal estate to trustees upon certain trusts therein declared.   The testator also by his will defined the terms " nearest heir " and " eldest lineal male descendant " in his will, and wherever else he may have used these terms, to mean, first, his son David Sears, and his male issue successively, etc.   The provisions of the will will be more fully stated hereafter.

1.  The first question which arises in the case is as to the validity of the trust created by the six deeds executed by David Sears in 1821.   The grantees in these deeds are the Wardens and Vestry of St. Paul's Church in Boston, and their successors in office.   The church itself was incorporated in 1820, as a Protestant Episcopal society and body politic.   St. 1819, c. 77.   Since the Prov. St. of 1754–55, c..12, the church wardens of Protestant Episcopal churches are bodies corporate, authorized to take in succession " all grants and donations, whether real or personal, made either to their several churches, the poor of their churches, or to them and their successors " ; and when the vestry is joined with them in the grant or donation, the church wardens and vestry together constitute the corporation.   3 Prov. Laws, (State

ed.) 778; Anc. Chart. 605.  St. 1785, c. 51.  Rev. Sts. c. 20, §§ 39 *et seq.*  Gen. Sts. c. 31.  Pub. Sts. c. 39.

In *Sohier* v. *Wardens & Vestry of St. Paul's Church*, 12 Met. 250, a bequest to the Wardens and Vestry of St. Paul's Church " to be received and held by the legatees, as the formation of a fund " for the support of a city missionary of the Protestant Episcopal Church, was held to be a valid charitable gift.  See also *Saltonstall* v. *Sanders*, 11 Allen, 446; *Weber* v. *Bryant*, 161 Mass. 400.

It is clear that the grantor could not create a trust for the benefit of his descendants forever.  *Kent* v. *Dunham*, 142 Mass. 216.  Nor could he create a trust for one of a series of his descendants, successively, unless such a one could be ascertained within a life in being and twenty-one years afterwards.  *Dungannon* v. *Smith*, 12 Cl. & Fin. 546.  It cannot be certain that there would be an heir by the name of Sears within the legal period, or that a demand would be made in that period for any income due.  This demand clearly appears to have been a condition precedent.  *Ibbetson* v. *Ibbetson*, 10 Sim. 495; *S. C.* 5 Myl. & Cr. 26.  *Thomson* v. *Shakespeare*, H. R. V. Johns. 612. *Wainman* v. *Field*, Kay, 507.  See *Lovering* v. *Lovering*, 129 Mass. 97.  This is not a case of definite successive limitations. The limitation is general for the benefit of all the descendants of David Sears answering to a particular description.

It is contended that, as the grantees were given discretion to apply one half of the income either to the accumulation of the fund, one half of the income of which was intended for the benefit of the grantor or his descendants, or to apply it to charitable or pious uses, the entire trust is invalid.

There is undoubtedly a class of cases where a fund is given for purposes which are charitable, or for other purposes in the discretion of the trustees which are legal, but are not charitable. In these cases the whole gift is held void for uncertainty.  *Morice* v. *Bishop of Durham*, 10 Ves. 521.  *In re Hewitt's estate*, 53 L. J. (N. S.) Ch. 132.  *Chamberlain* v. *Stearns*, 111 Mass. 267. *Nichols* v. *Allen*, 130 Mass. 211.

But it is settled by a long line of decisions in England, that, where trustees are given discretion to apply a fund either to a legal or an illegal object, the law forbids them to apply the fund

to the illegal object, and the trust is valid for the legal object. The leading case on this subject is *Sorresby* v. *Hollins*, 9 Mod. 221, where a discretion was given to executors to settle by purchase of lands, or otherwise as they should be advised, an annuity of £50 to be distributed in charity. The discretion to purchase lands was illegal, as violating the mortmain act. Lord Hardwicke said: "Can any court say, because one method is unlawful, that therefore the other is so, and the whole bequest void? No; for, if one bequest is lawful, that shall be pursued and take effect." To the same effect are the following cases. *Attorney General* v. *Parsons*, 8 Ves. 186. *Curtis* v. *Hutton*, 14 Ves. 537. *Salusbury* v. *Denton*, 3 Kay & Johns. 529. *Carter* v. *Green*, 3 Kay & Johns. 591. *Attorney General* v. *Goddard*, Turn. & Russ. 348. *Ingleby* v. *Dobson*, 4 Russ. 342. *Faversham* v. *Ryder*, 5 DeG., M. & G. 350. *University of London* v. *Yarrow*, 1 DeG. & J. 72. *Lewis* v. *Allenby*, L. R. 10 Eq. 668. *In re Hedgman*, 8 Ch. D. 156. See also *Williams* v. *Williams*, 4 Seld. 525. And in *Jackson* v. *Phillips*, 14 Allen, 539, 556, it is said by Mr. Justice Gray: "When a charitable intent appears on the face of the will, but the terms used are broad enough to allow of the fund being applied either in a lawful or an unlawful manner, the gift will be supported, and its application restrained within the bounds of the law."

This is not a case where the charitable trust is of a surplus remaining after an invalid gift has been satisfied. In such cases the validity of the gift to charitable purposes will depend on whether the amount required for the prior gift can be ascertained in order to fix the amount of the surplus, or on whether the prior gift is merely " honorary," as it is termed, and not a legal charge on the fund. *Chapman* v. *Brown*, 6 Ves. 404. *Fisk* v. *Attorney General*, L. R. 4 Eq. 521. *Hunter* v. *Bullock*, L. R. 14 Eq. 45. *Dawson* v. *Small*, L. R. 18 Eq. 114. *In re Williams*, 5 Ch. D. 735. *In re Birkett*, 9 Ch. D. 576.

There is, therefore, as to one half of the fund, a valid charitable trust, subject to an illegal discretion as to accumulation for the benefit of the grantor or his descendants, which will be rejected. This trust could not be altered in its terms by the trustees or by the creator of the trust. *Sewall* v. *Roberts*, 115 Mass. 262.

As to the other half of the fund, an invalid trust being created, the beneficial interest resulted to the donor. *Nichols* v. *Allen*, 130 Mass. 211, 212. *Olliffe* v. *Wells*, 130 Mass. 221, 223. *Lassence* v. *Tierney*, 1 MacN. & G. 551, 564, 565.

It is contended, however, that, as the whole fund was given to a charitable corporation, the corporation would retain the beneficial interest if any part of the trust could not be carried out. See *Attorney General* v. *Trinity College*, 24 Beav. 383, 399. While it is true that a gift to a church *eo nomine* is a gift to a charity, (*Baker* v. *Fales*, 16 Mass. 488, 495, *Jackson* v. *Phillips*, 14 Allen, 539, 553,) yet it does not follow that it may not be given for a purpose that is invalid, and in such case the church cannot take, (*Old South Society* v. *Crocker*, 119 Mass. 1,) although it might well take the beneficial interest as well as the legal title if no particular trust or use had been designated. *Sohier* v. *Wardens & Vestry of St. Paul's Church*, 12 Met. 250, 259.

2. The deed dated March 1, 1821, which was not delivered until some time before November 12, 1822, cannot affect the interpretation of the deeds relating to the pews, nor can it make the invalid trust valid.

3. The gift of $100 made on November 9, 1822, became a part of the fund, and is subject with it to the legal interpretation before mentioned.

4. The terms of the deed of January 1, 1824, cannot affect the disposition of the fund before created, or impose new conditions, or alter the terms of the former deeds, so far as the valid charitable trust is concerned. The Wardens and Vestry had by the former deeds discretion in the selection of charitable objects. By the deed now under consideration they agreed with Mr. Sears to devote one quarter of the income of the fund to a library. If such a library as is described in the deed is a charitable object, we can see no objection to their action. If it is not, then the agreement, so far as the prior deeds are concerned, is a nullity. We have no doubt that the deed in this respect created a valid charitable trust. While a limited and definite class of beneficiaries is first mentioned, the final provision is that it is to be used by the public generally. There is, therefore, not a gift for the benefit of a definite class, or of shareholders only, as in the cases of *Carne* v. *Long*, 2 DeG., F. & J. 75, and *In re Dutton*,

4 Ex. D. 54, but for the public, and such a gift is unquestionably valid. *Drury* v. *Natick*, 10 Allen, 169. *Fairbanks* v. *Lamson*, 99 Mass. 533. *Cary Library* v. *Bliss*, 151 Mass. 364, 373, 374. See also *Brown* v. *Pancoast*, 7 Stew. (N. J.) 321.

The question of difficulty arising under this deed, so far as the land is concerned, is whether the limitation to the grantor and his heirs created a condition giving a right to terminate by re-entry the estate previously granted, or whether a trust was created in favor of the grantor and his heirs. This question, for reasons hereinafter stated, we find it unnecessary to decide.

5. The deed to Trinity Church may be briefly disposed of. What Mr. Sears attempted to do was to make Trinity Church a trustee in the event of the plaintiffs not fulfilling their trusts. He conveyed to the grantee no right of his own, but "the contingent and conditional interest in said property and fund which the above named Wardens and Vestry of St. Paul's Church now hold and enjoy." The subsequent language of the deed amounts merely to an agreement on his part to waive a breach of any conditions on the part of the Wardens and Vestry of St. Paul's Church existing at the time the title to the fund should vest in Trinity Church. The language is as follows: "It being the intention of this deed, and the meaning of the grant herein made, that the right of forfeiture which may accrue to said Sears and his heirs from any act or omission on the part of said Wardens and Vestry of said St. Paul's Church will not be exercised or exacted, provided said Trinity Church . . . accept said trust and undertake to perform and do perform all the duties and obligations of said trust according to the true meaning and object of its founder, and not otherwise."

Other language in the deed shows that the new trustee was to take upon the same terms, conditions, and forfeitures as in the original deeds.

If this conveyance had been simply of the premises conveyed in the preceding deeds, it might operate to destroy the right of forfeiture, if any existed, in David Sears. *Rice* v. *Boston & Worcester Railroad*, 12 Allen, 141. See also *Guild* v. *Richards*, 16 Gray, 309, 317; *Van Rensselaer* v. *Ball*, 19 N. Y. 100, 103; *Schulenberg* v. *Harriman*, 21 Wall. 44. Construing the language of the deed as a whole, we are of opinion that the deed does not

convey, or purport to convey, any right of reverter then remaining in Mr. Sears.

As to the other questions in the case, we do not see that the deed is of any importance.  Mr. Sears had reserved no right to nominate or appoint a new trustee; nor does it appear that Trinity Church has ever accepted the trust, or attempted to act under it.

6.  The deed of February 27, 1854, could not alter the charitable trust already declared.  The other half of the fund was again made subject to an express trust void for remoteness, and the beneficial interest again resulted to the grantor.  The condition, if any, was void as creating a perpetuity.  *Brattle Square Church* v. *Grant*, 3 Gray, 142, 158.   *Otis* v. *Prince*, 10 Gray, 581.   *Cartwright* v. *Cartwright*, 3 DeG., M. & G. 982.   *Poor* v. *Mial*, 6 Madd. 32.   *Egerton* v. *Brownlow*, 4 H. L. Cas. 1.

The deed, however, would operate as a release as to matters of account prior to its date.  It also may operate as a release from the obligation voluntarily entered into by the Wardens and Vestry, in their discretion, by the deed of January 1, 1824, to expend one quarter of the income of the original fund for the purchase of books for the library.  Released from such obligation, the Wardens and Vestry were free to apply the income to objects of charity, in their discretion, according to the original deeds of trust.  If the language used in the deed now under consideration, stating the purposes for which the income was to be applied, indicate purposes not charitable, such language is of no effect to vary the trust declared in the deeds of March 1, 1821.

7.  On the facts stated, it appears that the Wardens and Vestry have continuously admitted that they held the one half of the income of the fund, which by the terms of the deeds was for the benefit of Mr. Sears and his heirs, and consequently one half of the income bearing fund itself, as trustees, and not adversely, under any claim of right in themselves inconsistent with a fiduciary relation.  We leave out of consideration for the moment the land, as this did not produce any income.

It is well settled that, in the case of an express trust, the statute of limitations does not run in favor of the trustee against the *cestui que trust*, unless the user of the former has been open and notorious against the claim of the latter.   In the case of implied

or constructive trusts, however, unless there has been a fraudulent concealment of the cause of action, the law is otherwise. *Boxford Religious Society* v. *Harriman*, 125 Mass. 321, 329. *Davis* v. *Coburn*, 128 Mass. 377, 380. *Dickinson* v. *Leominster Savings Bank*, 152 Mass. 49, 54. *Currier* v. *Studley*, 159 Mass. 17. But, independently of the statute of limitations, courts of equity will not assist a person who has slept upon his rights, and has acquiesced for a great length of time. *Speidel* v. *Henrici*, 120 U. S. 377. *Cholmondeley* v. *Clinton*, 2 Jac. & W. 1, 175; *S. C.* 4 Bligh, 1.

The trust in the case at bar is an express trust, and there has been no such open and adverse user as is necessary to set the statute in motion. The claim of David Sears to one half of the income has always been recognized by the plaintiffs; and they have also since his death recognized that in some way the Sears family had a claim under the trust.

The resulting trust in the case at bar is not a constructive trust. It was not forced upon the plaintiffs by operation of law against their will, but was assumed by them. They have never contended that they were not trustees. The trust deeds showed that the declared trusts were invalid, and they therefore held for other *cestuis que trust* than those declared. This fact distinguishes the case from that of *Churcher* v. *Martin*, 42 Ch. D. 312, 318, where the invalidity of the trust was due, not to the terms of the deed, but to the fact that the deed was rendered void because it was not enrolled according to statute; and therefore any holding under the terms of the deed was, of necessity, adverse from the start. It was not a question between trustee and *cestuis que trust*. Where the possession of property is held by a trustee not by virtue of any personal right or personally asserted right on his part, but is colored by a trust and confidence in virtue of which he received it, the identity of the *cestui que trust* is of very little importance, but the relationship is all important; and, so long as the relation of trust exists, it is a case of express trust, no matter who the *cestui que trust* may prove to be. *Salter* v. *Cavanagh*, 1 Dr. & Wal. 668. *Lister* v. *Pickford*, 34 Beav. 576, 582. *Patrick* v. *Simpson*, 24 Q. B. D. 128. *Soar* v. *Ashwell*, [1893] 2 Q. B. 390. *Warner* v. *Morse*, 149 Mass. 400.

In the case at bar, it is true that the only duty of the plaintiffs from the start was to pay over one half of the trust fund to David Sears; yet by their continued acknowledgment of an existing trust relation, and by making no assertion of any adverse claim, they induced a reliance on the existence of the fiduciary relation by virtue of which they expressly held the property.

As to the land conveyed to the plaintiffs by the deed of January 1, 1824, we do not think that sufficient appears to enable us to determine what should be done with it. It is stated in the agreed facts, that up to the date of the filing of the bill it has yielded no income, and has not been taxed. What has been done with it is left uncertain. We might infer from the language of the deed of February 25, 1854, that it had been used for church purposes, but even this is uncertain. No demand appears ever to have been made for it, and it may be that the use has been such as to amount to an adverse use, or that the defendants' rights, if any, have been lost by laches. We intend to express no opinion on these points. All that we can determine now is that enough does not appear to enable us to pass upon the question of title.

8. David Sears in his will provided, in article 17, that the beneficiary incomes of trust funds established by him should be, when demanded, " the sole property of my heirs having the right to receive the same successively, as therein described." By articles 20 and 21, all the residue of his real and personal estate is given to trustees, upon certain trusts therein set forth.

The provisions of article 17 are open to the same objections as the original trust to the same effect. It is impossible to determine that they must take effect within the lawful period.

The resulting trust in favor of David Sears must therefore pass to those entitled under the residuary clause. *Thayer* v. *Wellington*, 9 Allen, 283. *Lovering* v. *Lovering*, 129 Mass. 97.

It is contended, however, that the language of article 5 of the will leads to a different result. This is: " It is to be understood in this will, and wherever else I may have used the like terms, that by the terms 'nearest heir' and 'eldest lineal male descendant,' I intend first my son David, and his male issue successively, in order of seniority, *in infinitum* " (with the same definition as to his other sons and his daughters successively in default of

issue of each). "Said issue so receiving property to assume the name of such one of my sons deceased as he may at the time elect." It is argued that, as this term "nearest heir" was used in the deeds of March 1, 1821, and in the deed of February 25, 1854, this provision of the will supplied an interpretation clause to these deeds, so that they should read as if they contained a limitation of one half of the fund and its income to David Sears for life, remainder to his son David for life, remainder to his male issue successively, in order of seniority; and that therefore, under the decisions in *Lovering* v. *Worthington,* 106 Mass. 86, and *Tollemache* v. *Coventry,* 2 Cl. & Fin. 611, David Sears, Jr. took an estate for life, with remainder over. So far as any interest of David Sears, Jr. is concerned, it is of no importance whether he took a life estate or not, inasmuch as he received one half of the income during his life, with the acquiescence of all parties, and it is now too late to raise the question of the legality of these payments. *Attorney General* v. *Old South Society,* 13 Allen, 474, 495. It is a question of importance whether his eldest son, the defendant David Sears, 3d, is entitled to a life estate before the beneficial interest under the trust fails and becomes finally vested in those entitled under the residuary clause of the will of David Sears. We are not able to adopt the view that he is so entitled. The so called interpretation clause of the will is in no sense a devise or bequest of the interest of the testator in the fund. It would be highly dangerous to allow a man who had created an invalid trust, the beneficial interest in which had resulted in him, to explain fifty years later in his will that his real meaning was something different from what his words implied, and, without any words of devise, to allow the creation of a new trust by a new interpretation of the old deed. The deeds were complete, and not incomplete, as in *Bizzey* v. *Flight,* 3 Ch. D. 269.

It is clear, therefore, that all rights under the resulting trust are now vested in the trustees under the residuary clause of the will of David Sears, unless the fact that the testator in this clause excepted from the residue "any of the trust funds by me created during my life, or the incomes thereof, which are to be disposed of according to the trusts declared concerning the same, without reference to this item," leads to a different result. But

we are of opinion that it does not.   The reason for this provision is that the testator supposed that the trusts he had created were valid, and could be carried out.   If so, they would not fall within the residuary clause.   The resulting trust to the testator is not provided for except by the general words of the residuary clause, and it falls within them.

9. The plaintiffs state that, in their opinion, further accumulation of income, if not compulsory, would be injurious and undesirable.   They give, however, no reasons for such a conclusion. The founder of the trust, David Sears, provided that the income from the pews should be added annually to the trust fund to accumulate forever.

As to one half of the fund no question arises, as the plaintiffs must convey and transfer it to those entitled thereto.   There will, consequently, be no further income to accumulate.   All income accumulated by special deposit with the trust company will not be added to the fund, as it belongs under this decision to the trustees under the will of David Sears.

As to the other half of the fund, the question directly arises how far a provision to accumulate for a charitable purpose is valid.   In England the period within which accumulations are valid is defined by the St. of 39 and 40 Geo. III. c. 98, commonly called the Thellusson Act, and the provisions relating thereto apply to accumulations for charities.   *Martin* v. *Margham*, 14 Sim. 230.   In the absence of statute there is no definite limit to accumulations for charities, so far as the decisions are concerned.   The few cases bearing at all on the subject afford little assistance.   *Hawes Place Society* v. *Hawes Fund*, 5 Cush. 454.   *Odell* v. *Odell*, 10 Allen, 1.   *Harbin* v. *Masterman*, L. R. 12 Eq. 559.   1 Perry on Trusts, § 399.   Scott on Trusts for Accumulation, §§ 74–84.   In regard to this matter, one of three rules must be true: the accumulation must be valid forever; or it may be controlled by the court within reasonable and desirable bounds; or it must be subject to the same rules as an accumulation for private purposes.   There is good reason to suppose that the rule last named should not apply, for, if the object is not subject to the rule against perpetuities, there is no good reason why an accumulation for that object should be. It certainly would be as much the policy of the law to favor an

accumulation for charitable objects as to favor charitable objects. It often happens that the charitable purpose cannot be carried out without accumulation of a fund, sometimes for a long period of time.

There are also good objections to a compulsory perpetual accumulation even for a charitable purpose.  Much would depend on the terms under which the accumulation was to be made. There would be great public danger in allowing an accumulation indefinitely for a charitable purpose that was not to be carried out within some definite time.  Such a purpose would be practically no charitable purpose at all.  On the other hand, however, there are cases where the income from property might be directed to be accumulated to form a fund, the income of which fund was to be annually applied to charitable purposes, as in the case at bar.  Such an accumulation, it is evident, is less objectionable, as the income from the accumulating fund is constantly being applied to the charity year by year in larger amount.  There seems to be no more objection to such an accumulation than to the holding of property constantly increasing in value for the benefit of the charity.

We are of opinion, however, that the proper course is to hold that the limits of an accumulation for the benefit of a charity are subject to the order of a court of equity.  By this method of solving the difficulty, on the one hand an unreasonable and unnecessary trust for accumulation can be restrained, and on the other hand a reasonable accumulation can be allowed to carry out the intention of the benefactor and to secure the accomplishment of the trust in the best manner.  In *Woodruff* v. *Marsh*, 63 Conn. 125, 137, an accumulation of a reasonable part of the income was allowed for a hundred years.

To apply this principle to the case at bar.  It seems that to authorize equitable interference with the accumulation directed by the testator, the accumulation should be unreasonable, unnecessary, and to the public injury.  It is not enough that the trustees are not desirous to continue it, or that any one in behalf of the charity asks that it be not continued.  The court must be satisfied that there is good cause why the testator's directions should not be carried out.

Mr. Sears directed that the income from the pews should

accumulate to form a fund, the income of which should be paid over annually. There is consequently no locking up of the trust property altogether ; the income from it first passes into a fund, and then the income of that fund is paid out for charitable purposes. If the accumulation were stopped, the practical result would be to combine the trust property and the trust fund, and allow the whole income to be applied annually for charitable purposes. Such a proceeding would increase the annual income on one hand, and at the same time put an end to a constantly increasing income from the present "fund," so called. As this accumulation was to serve apparently no definite or special object, there seems to be no objection to putting an end to it, if there is good reason therefor. No reason, however, is given by the plaintiffs as to why such a course should be taken, and we are of opinion that the court should not act as requested under such circumstances.

It must be borne in mind that hereafter the trust property and the trust fund held by the plaintiffs for charitable purposes will be one half part only of the present fund.

We do not intend to preclude the plaintiffs from presenting this question hereafter to the court, if they should see fit to do so ; but merely to decide that, as the case is presented, enough does not appear to warrant the court in determining the question.

10. In regard to the continuance of the library, it is alleged in the bill that it is practically of no value, and is not used by any one ; that the expense of employing attendants to keep it open, and of lighting and heating, and other incidental outlays necessary to maintain it, greatly outweigh any possible advantage that can accrue from its use, and would be an unjustifiable employment of the plaintiffs' funds. As the case has been heard on the bill as amended and the answers thereto, and certain agreed facts, and as the answers and the agreed facts do not controvert these statements of fact, we must take these allegations to be true ; and we are of opinion that it is no longer the duty of the plaintiffs to expend the income of the fund in the purchase of books for the library.

It follows from these considerations :

1. That one half of the trust fund consisting of personal prop-

erty other than the library is held by the plaintiffs in trust for the trustees under the residuary clause of the will of David Sears.

2.  That the remaining half of the trust fund is to be held by the plaintiffs in trust for charitable uses, the income to be appropriated according to their discretion.

3.  That there need be no further appropriation of income for the support of the library.

4.  That enough does not appear to enable us to determine whether the income from the pews should be further accumulated.

5.  That the income specially deposited by the plaintiffs is to be paid over to the trustees under the residuary clause of the will of David Sears.

6.  That enough does not appear to enable us to pass upon the title to the land conveyed by the deed of January 1, 1824.

*Decree accordingly.*

*John C. Gray*, for the plaintiffs.

*R. Olney*, for Frederick R. Sears and others.

*J. L. Thorndike*, for David Sears, eldest grandson of the testator.