# Balch Estate

98

*Howard H. Yocum,* for accountant.

*William L. Fox,* of *MacCoy, Evans & Lewis, Philip R. Hepburn,* of *Norris, Lex, Hart & Ross, R. Sturgis Ingersoll, Henry J. Lotto, Samuel W. Morris* and *John Russell, Jr.,* of *Morgan, Lewis & Bockius, Francis M. Richards, Jr., James Alan Montgomery, Jr., Lewis H. Van Dusen, Jr.,* and *Eric A. McCouch,* of *Drinker, Biddle & Reath,* for claimants.

*Harry W. Kurtzman* and *Irvin Stander,* for Commonwealth.

KLEIN, P. J., May 13, 1960.—Emily Swift Balch died on January 6, 1917, leaving a will and codicil by which, inter alia, she devised and bequeathed her residuary estate to her executors in trust to pay the net income therefrom in equal shares to her two sons, Edwin Swift Balch and Thomas Willing Balch, for the terms of their natural lives, upon the terms of a spend-

thrift trust, with further provisions to become operative upon the death of either of her sons leaving descendants him surviving, not necessary to recite, and in default of descendants surviving either son to hold his one-half part of the estate for the benefit of her surviving son, or of his descendants, if he should be deceased, leaving descendants surviving him. Testatrix then provided as follows:

"(4) And in case of the death of my sons without leaving descendants them surviving, then upon the death of my surviving son, In Further Trust to employ and devote the whole of my said residuary estate to the establishment, endowment and maintenance of a library in the State of Pennsylvania, the plans and details of the same to be left to the discretion of my surviving Trustee the Trust Company, subject however to the right of my two sons (or the survivor of them) by writing lodged with the remaining Trustee the Trust Company to arrange and formulate the details for the establishment and administration of the said Library in their lifetime, to take effect after their death, and further also subject to the right of my two sons or the survivor of them should it appear to them or the survivor that the establishment of such Library is for any reason unnecessary or undesirable then by like writing lodged as aforesaid to suggest and direct in lieu thereof the establishment and maintaining of some other institution, either charitable or educational and either independent or forming part of some like existing institution and to arrange and formulate the details thereof, including, if they see fit, the nomination of Managers, which suggestion and direction I desire my surviving Trustee to adopt and follow."

A copy of the will and codicil is annexed hereto.

The fund presently accounted for was awarded to the present accountant by adjudication of Van Dusen, J., dated October 24, 1927, and the occasion of the

filing of the present account is stated to be the realization, by accumulation of income, of a fund of approximately $2,000,000.

Testatrix' sons Edwin Swift Balch and Thomas Willing Balch, died, respectively, on March 15, 1927, and June 7, 1927, without leaving descendants surviving them, so that the trust under the will of testatrix, as quoted above, for the establishment, endowment and maintenance of a library in the State of Pennsylvania became operative. Prior to their deaths, on January 16, 1922, the said Edwin Swift Balch and Thomas Willing Balch executed an instrument addressed to the Philadelphia Trust Company, now Fidelity-Philadelphia Trust Company, purporting to be their "Direction as to the sort of institution we desire the Philadelphia Trust Company to found in case circumstances should require you to do so", by the provisions of which it was provided, inter alia, as follows:

"We desire you to found and establish an institution in eastern Pennsylvania, in such place as you may select, between the Susquehanna River and the Delaware River, but not less than twenty (20) miles from the present City Hall, Philadelphia.

"This institution shall be called the '*BALCH INSTITUTE*' and this name shall always be retained for it.

"The 'Balch Institute' shall be kept entirely separate from all other institutes, libraries, museums, art galleries, colleges, universities, or other charitable or educational organizations.

"The 'Balch Institute' shall never be conducted in the interest of any religious sect, church denomination, political party, or special school of thought or philosophy.

"In order to carry out this foundation, we desire:

"*I*. That you, the Philadelphia Trust Company shall cause the 'Balch Institute' to be incorporated under the laws of the State of Pennsylvania, and that you shall

nominate and appoint the members of the first Board of Directors. The Board of Directors shall consist of not more than fifteen (15) Directors, who shall all be men, including a President, a first and a second Vice President, a Recording Secretary, a Corresponding Secretary, a Treasurer, and nine (9) other members, who shall thereafter perpetuate themselves, except that three (3) of them shall always be appointed by the Philadelphia Trust Company.

"*II*. That in case our mother's (Emily Swift Balch) estate becomes available for the purpose, you continue to hold, invest and reinvest the principal and other property of her estate in such securities or property as you may think desirable, without restriction to what are known as legal securities, and that you have full power of sale of all or any real estate in said estate, at such prices and upon such terms as you shall deem fit, and without obligation on the part of the purchaser to see to the application of the purchase money: and that you accumulate and add thereto all the net income of the estate until a fund of not less than Two million (2,000,000) Dollars shall be realized; and that thereafter you accumulate and add to this fund annually in perpetuity one-half (½) of the net income to the fund: the remaining half (½) of the net income to be disposed of for the benefit of the Balch Institute as will be explained further on.

"*III*. That, in case one or both of our estates become available for the purpose, you apply them under the terms of our respective Wills, to the establishment and upkeep of the Balch Institute.

"*IV*. The remaining one-half of the net income of the estate of Emily Swift Balch and the portions of the net income of the estates of E d w i n  S w i f t  Balch and Thomas Willing Balch set apart for the benefit of the Balch Institute shall be applied and used as follows:

"(a) To be held and accumulated for such time as in the discretion of the Board may be sufficient to produce a fund requisite for the purpose of purchasing a good sized piece of land allowing for increase of buildings in future years.

"(b) To be held and accumulated for such time as in the discretion of the Board of Directors may be sufficient to produce a fund requisite for the erection of a unit or units of the buildings contemplated under the general architectural scheme which may have been adopted by the Board for the institution.

"(c) After this, the remaining net income, in such proportions and to such extent as to the Board may seem fit, is to be applied: First, to the accumulation of a fund sufficient for the erection of any further building or buildings contemplated: Second, for the maintenance, equipment and upkeep of the first unit and succeeding units; Third, for the salaries and wages of all officers and employees; Fourth, for the purchase and care of books and for the purchase and care of works of art of all kinds; Fifth, Towards the payment of the expenses of subsidary things, such as meetings, lectures, etc., given under the direction and auspices of the Institute."

After further directions as to the management and administration of the fund and the acceptance of gifts or additions thereto, which it does not appear necessary to recite in this adjudication, the instructions continued:

"*VIII.* All buildings of the Balch Institute must be fireproof, plain and practical, but as far as possible architecurally handsome. The plans of the building or buildings must be drawn so as to permit growth. Only part of the Institute is to be built at first and more is to be added when necessary and as this is to be done from the income, part of the income may have to be put aside for a building fund.

"*IX*. We want the Balch Institute to be an institution affording to both sexes, of all ages, on equal terms, opportunities for education and improvement. To accomplish this, we wish the Institute to consist of a good library and an auxiliary museum.

"*X*. The library shall be modelled, in a general way, on public or university libraries in regard to arrangement of books, cataloguing, book stacks, etc. Books on all subjects, including high class fiction, shall be admitted.

"*XI*. The Museum department of the Institute shall be only an adjunct or auxiliary of the library. It shall not be a separate thing nor conflict with nor supersede the library in any way. The Institute may acquire, by purchase or gift, such things as pictures, sculptures, etchings, etc.; maps and charts; ethnographical specimens, especially American; (all terms used in the widest sense) ; and other similar things of various kinds. All these can be exhibited permanently, or from time to time, or merely kept stored, in the discretion of the Board of Directors. But we want all books, works of art, or ethnographical specimens coming from our estates, or accepted as gifts, or purchased for the Institute, to be kept permanently by the Institute and made accessible to students.

"*XII*. As an auxiliary to the library and the museum, lectures (whether single or in courses) and entertainments of an educational character, with or without pictorial illustrations, may be given in the Balch Institute at the discretion of the Board of Directors. We do not wish to lay down hard and fast lines about such meetings or talks, beyond saying that we desire them to spring, so to speak, naturally from the subjects especially stressed in the library and in the museum.

"*XIII*. The foregoing directions are an amplification through evolution of several sets of directions we have

drawn up for you in the past four years concerning the Will of our mother, Emily Swift Balch, and which we have handed over to you and retired each in turn. We may fill up some details of the present set hereafter, but if we do not, you are hereby authorized to found in due time the Balch Institute in accordance with the foregoing directions."

According to the statement of proposed distribution the "Balch Institute" referred to in the aforesaid instructions or directions dated January 16, 1922, by testatrix' two sons to The Philadelphia Trust Company, has not yet been incorporated.

As noted above, the statement of proposed distribution recites that, about November 5, 1953, upon a review of the assets of the estate at market values current, the principal fund, with its accumulations of income, amounted to $2,013,090. Pursuant to provisions of the will and the instrument of Edwin Swift Balch and Thomas Willing Balch, dated January 16, 1922, the income thereafter was transferred to a separate "Income Accumulation Account" for investment. The Fidelity-Philadelphia Trust Company, as surviving trustee under the will of Emily Swift Balch, has also filed an "Income Accumulation Account", designated as the first account of Fidelity-Philadelphia Trust Company, surviving trustee of the estate of Emily Swift Balch, deceased, (Income Accumulation Account), stated from December 4, 1953, to March 6, 1958, and has submitted to the auditing judge at the audit thereof a supplemental account stated from March 6, 1958, to September 18, 1959. The audit of these accounts is also before the present auditing judge in a separate proceeding under the same court number, however, and will be adjudicated concurrently herewith.

The statement of proposed distribution suggests that "the court may be asked to pass upon the legal

propriety of the directions in the Instrument dated January 16, 1922, signed by Edwin Swift Balch and Thomas Willing Balch and lodged with the Fidelity-Philadelphia Trust Company, (formerly the Philadelphia Trust Company), the remaining Trustee; and upon the question whether all the directions are within their powers under the Will of Emily Swift Balch, deceased, particularly the validity of the direction to accumulate an infinitely large sum for a finite need.

"If the Court should find that any of the directions in the Instrument dated January 16, 1922 are invalid or are legally incapable of performance, then, in view of the disposition in the Will of the testatrix of her residuary estate 'In Further Trust to employ and devote the whole of my said residuary estate to the establishment, endowment and maintenance of a library in the State of Pennsylvania, the plans and details of the same to be left to the discretion of my Surviving Trustee, the Trust Company, subject however to the right of my two sons (or the survivor of them) by writing lodged with the remaining Trustee the Trust Company, to arrange and formulate the details for the establishment and administration of the said Library', the Court will be asked to determine the extent of the discretion of the Fidelity-Philadelphia Trust Company, (formerly the Philadelphia Trust Company), the Trustee, in the premises."

The Academy of Natural Sciences, the Athenaeum of Philadelphia, the Franklin Institute of the State of Pennsylvania, the Historical Society of Pennsylvania and the Library Company of Philadelphia, have, through their counsel, filed a joint brief in which they contend that:

(1) The sons' instructions to the trustee are void since they disregard the intent and directions of testatrix;

(2) The portion of the principal which is to be perpetually accumulated never vests in the charity and such provision violates the rule against perpetuities; and

(3) The sons' instructions defeat the intent of testatrix and are void in their entirety.

Mr. Yocum, counsel for the accountant, and Mr. Stander, on behalf of the Attorney General of the Commonwealth, as parens patriae, vigorously oppose the position of the objecting charities and maintain that they have no legal standing to question the validity of the trust, and, if they have the right to be heard, there is no merit to their position because: (1) Testatrix has provided for the establishment of a valid charitable trust and her wishes must be respected; and (2) the sons' instructions, even if ineffectual and void, cannot be permitted to destroy the valid charity created by testatrix.

In support of their contention that the charities have no standing in this matter, Mr. Yocum and Mr. Stander rely upon Wiegand v. The Barnes Foundation, 374 Pa. 149 (1953), in which the Supreme Court held that a suit can be maintained for the enforcement of a charitable trust by the Attorney General or other public officer, or by a cotrustee, or by a person who has a special interest in the enforcement of the trust, but not by a person whose only interest is that which he enjoys in common with other members or segments of the public. In the opinion of the auditing judge, the authority of the Wiegand case must be limited to situations dealing with the enforcement of existing charitable trusts and has no application to cases involving the creation of such trusts. To hold otherwise, would result in an improper delegation of a purely judicial function to the executive branch of the State government and would prevent the free application of the cy pres doctrine in proper cases. We therefore hold that a

charitable organization, which claims a fund by cy pres, has the right to appear at the audit of a fiduciary's account to make objection to an award for a charitable purpose which it contends is illegal and, therefore unenforceable.

In the light of this conclusion, we have studied testatrix' will and the letter of instructions of her two sons with great care. In our opinion, the objections which have been raised are all entirely devoid of merit. Testatrix has provided for the establishment of a valid, enforceable charity and it is the duty of this court to make certain that her wishes are respected and her estate used in accordance with her direction. We also agree with counsel for the trustee that the sons' directions must be carried out, to the extent that they are valid, and disregarded in all other respects.

Legacies for religious or charitable uses have always been signally favored in Pennsylvania: The Domestic and Foreign Missionary Society's Appeal, 30 Pa. 425, 433 (1858). In Franklin v. The City of Philadelphia, 2 Dist. R. 435, 436 (1893), Judge Arnold said:

". . . we may congratulate ourselves that the law of Pennsylvania, as administered by her courts from the beginning of the province, has always been broad enough to discern the object of every charity, and to preserve and enforce it, notwithstanding any defects, such as want of power in the trustees or otherwise. The rule with us when a charity is created, is to adopt every means to uphold it; and every attack upon it, unless founded upon the strongest reasons, shall fail. Pennsylvania and Philadelphia are noted for their charities. They have the fostering care of their citizens and the powerful protection of their courts. No narrow or arbitrary rules of construction are allowed to stand in their way."

Judge Arnold said further, at page 440:

"But neither statutes nor decisions can choke up the well springs of love and affection which fill the human breast and lead charitably disposed persons to give their property for charitable uses; and when statutes are made to prevent it being done one way, means are found to do it another. Shultz's Ap., 80 Pa. 396, proves this."

A gift for charity should not be wantonly set aside. On the contrary, the astuteness of the court should be exercised, if necessary, to maintain and uphold it: Pepper's Estate, 154 Pa. 331, 335 (1893). In the present case, it requires no astuteness to conclude that testatrix created a valid charitable trust. Rather, it would require considerable astuteness to present a convincing argument that it should be set aside.

There is a fundamental distinction, in the enforcement of charitable trusts, between those parts of the instrument of conveyance which create the gift and state its purpose and those which direct the manner of its administration. This distinction was emphasized in City of Philadelphia v. Heirs of Stephen Girard, 45 Pa. 9 (1863), one of the leading cases upon which much of the law pertaining to charitable trusts in the United States is based. Chief Justice Lowrie said, at page 25:

"In all gifts for charitable uses the law makes a very clear distinction between those parts of the writing conveying them, which declares the gift and its purposes, and those which direct the mode of its administration. And this distinction is quite inevitable, for it is founded in the nature of things. We must observe this distinction in studying Mr. Girard's will, otherwise we run the risk of inverting the natural order of things by subordinating principles to form, the purpose to its means, the actual and executed gift for a known purpose to the prescribed or vaticinated modes of administering it, that are intended for adap-

tation to an unknown future, and of thus making the chief purpose of the gift dependent on the very often unwise directions prescribed for its future security and efficiency."

In the orphans' court, the great, general and controlling rule is that the intent of testator shall prevail: Clark Estate, 359 Pa. 411 (1948) ; Scott's Estate, 313 Pa. 155 (1933). The ascertainment of this intention is the pole star long fixed for the guidance of the court in interpreting wills: Richley Estate, 394 Pa. 188 (1958) ; Weaver Estate, 390 Pa. 128 (1957) ; Lyle Estate, 374 Pa. 344 (1953) ; Britt Estate, 369 Pa. 450 (1952). Moreover, the question in expounding a will is not what testator meant but what is the meaning of the words he actually used: Swope Estate, 383 Pa. 494, 496 (1956) ; Rosengarten Estate, 349 Pa. 32, 38 (1944).

With these basic principles in mind, let us scrutinize the language testatrix used to create the charitable trust, the validity of which is now being questioned. The crucial language is found in paragraph eighth, in which after giving the residue of her estate to her executors, her sons, Edwin Swift Balch and Thomas Willing Balch, and the survivor of them, and the Philadelphia Trust Company, now Fidelity-Philadelphia Trust Company, in trust for the benefit of her sons and their descendants, she provided in subparagraph (4) that in case of the death of the sons, without leaving descendants them surviving (which eventuated), then upon the death of the surviving son, her estate should be held in further trust for the creation of a library.

Although this subparagraph is written as one continous provision, without break or subdivision in the will, in order to faciliate our study, we will set it down as if it were written in separate sections, pointing up the four particular directions contained therein which formulate the creation of the library:

(1) ". . . to employ and devote the whole of my said residuary estate to the establishment, endowment and maintenance of a library in the State of Pennsylvania,

(2) "the plans and details of the same to be left to the discretion of my surviving Trustee and Trust Company,

(3) "subject however to the right of my two sons (or the survivor of them) by writing lodged with the remaining Trustee the Trust Company to arrange and formulate the details for the establishment and administration of the said Library in their lifetime, to take effect after their death,

(4) "and further also subject to the right of my two sons or the survivor of them should it appear to them or the survivor that the establishment of such Library is for any reason unnecessary or undesirable then by like writing lodged as aforesaid to suggest and direct in lieu thereof the establishment and maintaining of some other institution, either charitable or educational and either independent or forming part of some like existing institution and to arrange and formulate the details thereof, including, if they see fit, the nomination of Managers, which suggestion and direction I desire my surviving Trustee to adopt and follow."

We can eliminate what we have chosen to designate subsection (4) from our consideration, because the sons concurred with their mother as to the desirability of establishing a library in preference to some other charitable or educational institution.

Testatrix' dominant and pervading purpose and intention, in the event that her two sons should die without descendants, was to "employ and devote the whole of my said residuary estate to the establishment, endowment and maintenance of a library in the State of Pennsylvania." Of this, there can be no serious doubt.

It is evident, however, that there is some overlapping of authority in the powers given to the corporate trustee and those given to the sons. Apparently both were assigned the identical responsibility of formulating the "details" for the establishment of the library. It is our duty to attempt to resolve this apparent ambiguity.

Let us study testatrix' language more carefully to determine what she really intended. The responsibility for formulating the "plans and details" for "the establishment, endowment and maintenance" of the library was entrusted primarily to the corporate trustee. To the sons was assigned the right to modify the surviving trustee's decision by arranging and formulating "the details for the establishment and administration of the said library".

In our opinion the omission of the words "plans" and "endowment" in the language conferring the sons' powers is most significant. Both "plans and details" were left to the corporate trustee, whereas the sons' authority was limited to "details". The word "plans" has a much broader implication and scope than the word "details". "Plan" is the general word for a proposed method of action or procedure: Webster's Collegiate Dictionary (5th Ed.) It contemplates the arrangements for a project in its entirety, whereas "detail" is a minute or subordinate part as distinguished from the larger structure or general concept. The word "detail" means a minute portion, one of the small parts, a particular or item; the word is used chiefly in the plural, as, the *details* of a transaction: Webster's International Dictionary; State v. Williams, 143 Ala. 501, 505, 39 So. 276 (1904).

We must therefore conclude that the primary responsibility for the creation of the library was vested in the corporate trustee and that its authority was intended to transcend that given to the sons. Major

decisions were intended to be made by the corporate trustee. The instructions given by the sons should, of course, be respected, but only to the extent that they should prove to be legal, practicable and within the scope of their power to "formulate the details". Nothing that the sons might advise or suggest could, in any manner or to any degree, destroy the validity of the charitable trust proposed by testatrix.

The failure of testatrix to include the word "endowments" in describing the area of responsibility assigned to the sons is, in our opinion, of the utmost importance in interpreting her language. "Endowment" has been defined as "property or pecuniary means bestowed as a permanent fund; as the endowments of a college, a hospital or a library": Wagner Institute's Appeal, 116 Pa. 555, 564 (1887). The use of the word "endowments" by testatrix must be construed as referring to the permanent funds of the library to be used in the years to come as a supplement to its regular income, as contrasted to the funds required for the building and equipping the library. The responsibility for these funds was given to the corporate trustee; not to the sons.

All of the provisions in the sons' letter of instructions to the trustee, providing for the perpetual accumulation of income, were obviously directed to the creation of an endowment fund for the future use by the library, after its establishment. These instructions were beyond the scope of the sons' powers. We therefore rule that testatrix' two sons exceeded their authority in all instructions given by them to the corporate trustee concerning the accumulation of the income, and that such instructions may be disregarded by said trustee as being void and inoperative.

Even if we were to assume, arguendo and contrary to our ruling, that testatrix' sons had the right to control the manner in which the income was to be accumu-

lated to establish an endowment fund, we fail to find any illegality in their direction to so accumulate a portion of the income perpetually. The gift to the proposed library was a vested gift for a valid charitable purpose. Charities are excluded from the prohibition against accumulations contained in section 9 of the Accumulation Act of April 14, 1931, P. L. 29, as amended, as well as the Estates Act of April 24, 1947, P. L. 100, sec. 6(b) (1), as amended: Biddle's Appeal, 99 Pa. 525 (1882) ; Archambault's Estate, 308 Pa. 549 (1932) ; McKee Estate, 83 D. & C. 492 (1953), affirmed per curiam 378 Pa. 607. See also Franklin v. The City of Philadelphia, supra, in which the court upheld the validity of an accumulation for 200 years set up by the illustrious Benjamin Franklin in his will.

Counsel for the objecting charities cite and rely upon Russell v. Girard Trust Co., 171 Fed. 161 (C.C.E.D. Pa. 1909), affirmed 179 Fed. 446 (3rd Cir. 1910), in which, by written agreement, a trust of approximately $2,000 was created, to accumulate the income until the principal and accumulated income equaled the debt owed by the State of Pennsylvania, which, at the time of the conveyance in trust, amounted to $40,000,000, and then to pay over the principal and its accumulations to the Treasurer of the State of Pennsylvania "for the purpose of discharging the whole indebtedness of the State and for no other purpose whatever". The court held that the State took no vested interest in the fund, but was to receive the benefit of it only on a contingency which might never happen, and that the gift was therefore void for remoteness of vesting. The court clearly indicated, however, that if the gift were vested, as is the gift in the instant case, the gift would have been valid.

In List Trust, 6 Fiduc. Rep. 119 (1955), testator directed that one-fifth of the income earned on a gift to a church be accumulated perpetually and added to

the endowment fund. Counsel for the church contended that a perpetual accumulation of this nature is subject to the control of the court, which should either award it to the church free of the direction to accumulate, or, in the alternative, place a limit on the duration of the accumulating, citing §442, A. L. I. Restatement of the Law of Property, and St. Paul's Church v. Attorney General, 164 Mass. 188, 204, 41 N. E. 231, in support of his position. We denied the church's request, however, holding that the trust created no grave economic or social problems worthy of serious concern at this time. Although the fund before us is very much larger than the one involved in the List case, we see no need for concern, especially in view of the grave need for additional libraries in Pennsylvania.*

If, at any time in the future, the endowment fund should increase to such unconscionable proportions as to arouse serious concern, the proper authorities can, by appropriate proceedings, present the problems to the court for such relief as may be deemed necessary.

In view of our conclusions that testatrix has created a valid charitable trust for "the establishment, endowment and maintenance of a library in the State of Pennsylvania" and that there is no legal obstacle to accumulations for the benefit of valid charities, any objections to the use by the trustee, for the charitable purpose defined in the will, of the fund which has already been accumulated and is the subject matter of the so-called "Income Accumulation Account", must be dismissed. The trustee will therefore be directed to consolidate the two accounts and to make all of the assets in its possession belonging to this estate avail-

---

\* See Report of Governor's Commission on Public Library Development, of which Albert M. Greenfield, of Philadelphia, is chairman, which indicates that Pennsylvania stands thirty-second among the States of the country in free library services.

able for the uses and purposes set forth in testatrix' will.

The auditing judge feels obliged to observe that he is at a loss to understand how such institutions as the Academy of Natural Sciences, the Franklin Institute or the Historical Society, worthy as they are, could possibly, under any conceivable circumstances, have any interest in this trust. Testatrix provided for "the establishment, endowment and maintenance of a library in the State of Pennsylvania". Although the aforementioned institutions may each maintain a library as an incidental accessory to carrying out their primary purposes, they cannot be regarded as libraries, in the usual and customary meaning of the word, and certainly not within the contemplation of testatrix, any more than a medical school, which operates a library as an adjunct to its teaching program, could be regarded as a library. Even if these institutions were correct in their contention that Mrs. Balch's desire to establish a library with her estate has been frustrated by her sons' illegal directions, a conclusion which appears to be completely untenable, it is incomprehensible to the auditing judge how they, or any other institutions which are not primarily and fundamentally libraries, could hope to benefit in any manner or degree under this decedent's will. The objectants are not *libraries* and it appears to be evident that in no event could any institution other than a library receive any share of Mrs. Balch's estate. See McKee Estate, 83 D. & C. 492, 524 (1953) ; Pepper's Estate, 154 Pa. 331, 334 (1893).

The orphans' court, in the exercise of its control and direction of trustees in the use and disposition of property belonging to charitable trusts, possesses the broad visitorial and supervisory powers of the Commonwealth. Its jurisdiction is exclusive: Toner's Estate, 260 Pa. 49 (1918) ; The John C. Mercer Home v.

Fisher, 162 Pa. 239 (1894); Lehigh University v. Hower, 159 Pa. Superior Ct. 84, 93 (1946).

In view of the unusual situation which exists in this case and the many serious and complex problems which will confront the trustee in the establishment of a library in accordance with testatrix' directions, as amplified by her sons' instructions, the auditing judge will, in the exercise of the court's visitorial and supervisory powers, follow the practice, which has been successfully employed in other similar cases, of retaining jurisdiction over the administration of the estate until the library building is completed and is actually in operation and serving the public. See Estate of Charles E. Ellis, no. 154 of Oct. 1910, Phila. O. C. (Adj. Dec. 28, 1959, not reported); Estate of Clarence A. Rowell, no. 611 of 1932 Phila. O. C. (Adj. Feb. 26, 1959, not reported). See also Craig's Estate, 56 D. & C. 135, Aff'd 356 Pa. 564 (1947); Ashbridge's Estate, 61 D. & C. 279 (1948); Wanamaker Estate, 67 D. & C. 517, Aff'd 364 Pa. 248 (1950); McKee Estate, 83 D. & C. 492, 524, Aff'd 378 Pa. 607 (1954).

In further exercise of this power, the auditing judge has, by separate decree bearing even date herewith, appointed Cuthbert H. Latta, Esq., as amicus curiae, to act in the nature of a proctor and liaison officer between the Fidelity-Philadelphia Trust Company, the trustee, and the court.

The Fidelity-Philadelphia Trust Company is directed to submit monthly reports to the amicus curiae, until further order of the court, setting forth the progress it is making with respect to the establishing of the library, and also semiannual reports summarizing the current financial condition of the estate.

The amicus curiae is directed to file reports with the auditing judge every three months, reviewing the trustee's actions, setting forth his views with respect thereto and making such recommendations as he may deem

advisable. If any critical or extraordinary circumstance should arise in the implementation of this program, the amicus curiae is further directed to make prompt report of the situation, together with his recommendations.

The amicus curiae will receive such compensation for his services as the court shall, from time to time, order and direct.

In view of the fact that the library situation in Pennsylvania has been carefully studied and surveyed recently, the auditing judge suggests that the trustee and Mr. Latta consult with the Governor's Commission on Public Library Development, which will undoubtedly be in a position to make valuable suggestions and perhaps make the services of members of its technical staff available to the trustee. . . .

And now, May 13, 1960, the account is confirmed nisi.

### Decree

And now, May 13, 1960, Cuthbert H. Latta, Esq., is appointed amicus curiae, with the powers of a master, to act in accordance with, and pursuant to instructions contained in the adjudication of even date herewith in the above entitled estate, and to receive such compensation for his services as the court shall, from time to time, order and direct.