## RUSSELL v. GIRARD TRUST CO.

### (Circuit Court, E. D. Pennsylvania. June 8, 1909.)

### No. 65.

**1. PERPETUITIES (§ 8*)—REMOTENESS OF GIFT TO CHARITIES—CONDITIONS.**

If a charitable gift is present in its terms, and is intended to take effect at once, without any intermediate estate, and has therefore vested, the rule against accumulation does not apply; but where it is contingent, or is not intended to vest until the happening of some inevitable future event, the test of the rule against remoteness is to be applied, and if the contingency or the happening of the condition precedent may by possibility be deferred beyond a life or lives in being and 21 years and a fraction thereafter, the limitation is bad under the rule, and a resulting trust will immediately arise in favor of the settlor, and he may reclaim the fund at any time.

[Ed. Note.—For other cases, see Perpetuities, Cent. Dig. §§ 57–66; Dec. Dig. § 8.*]

**2. PERPETUITIES (§ 8*)—VALIDITY OF CHARITABLE TRUST—REMOTENESS.**

A settlor deposited money in trust, to be "accumulated for the benefit of the state of Pennsylvania in the way and manner hereinafter mentioned." The contract then provided that the trustee should invest the money and all its accumulations in the public stocks of the state whenever they could be purchased within a certain price, otherwise in government or other stocks, until the time should arrive when the fund so accumulated, together with any other sums which might be deposited with the trustee for a like purpose, should "be equal to the debt at that time owed by the state," when it should be paid over to the Treasurer of the state, "for the purpose of discharging the whole indebtedness of the state, and for no other purpose whatsoever." The amount deposited was $2,000, and the indebtedness of the state at that time was $40,000,000. *Held*, that the state took no vested interest in the fund, but was to receive the benefit of it only on a contingency which might never happen, or might happen at some indefinite time in the future, which might exceed the limitation of the rule against remoteness or accumulations, and that the trust was therefore void, and the fund recoverable by the personal representative of the settlor after his death, as held by the trustee on a resulting trust for the benefit of the decedent.

[Ed. Note.—For other cases, see Perpetuities, Cent. Dig. §§ 57–66; Dec. Dig. § 8.*]

In Equity. On final hearing.

Arthur W. Machen, Jr., and George Wharton Pepper, for complainant.

A. H. Wintersteen, for defendant.

J. B. McPHERSON, District Judge. This record presents an unusual case for determination. The complainant is the ancillary administrator of Charles F. McCay, and is suing the defendant company on the ground that a trust which the decedent established in his lifetime was void ab initio because it offended the rule concerning perpetuity or accumulation, and therefore that the defendant is holding the fund upon a resulting trust of which McCay himself could have claimed the benefit until his death in 1889, and to which his administrator, suing in behalf of the decedent's estate, or of the children and next of kin, may now make successful demand. The trust was established by a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

written agreement executed in December, 1848, between McCay, who was then a citizen of Georgia, and the Girard Trust Company of the city of Philadelphia. Apparently McCay was curious about the possible results to be attained by compounding interest, for it is difficult to divine what other reason would have induced him to make the extraordinary provision that is disclosed by the trust agreement:

"* * * Whereas, the said Charles F. McCay has deposited with the said company the sum of three hundred and seventy-seven dollars and thirty-five cents for the purpose of having the same, together with such other additional sums of money as he may hereafter deposit, accumulated for the benefit of the state of Pennsylvania in the way and manner hereinafter mentioned: Now these presents witness that, in consideration of the premises and of the sum of one dollar, lawful money unto them paid by the said Charles F. McCay at the time of the execution hereof, the receipt whereof is hereby acknowledged, the said Girard Life Insurance, Annuity & Trust Company of Philadelphia, for themselves and their successors, do hereby covenant, promise and agree to and with the said Charles F. McCay, his heirs, executors and administrators, in manner following, to say: First, that they, the said company, shall and will invest the said sum of three hundred and seventy-seven dollars and thirty-five cents so as aforesaid deposited, and all and every such other sum and sums as may hereafter be deposited in like manner by the said Charles F. McCay, in the public stocks issued by the state of Pennsylvania, and collect the interest on these stocks, and after deducting two and one-half per cent. of this interest as their compensation for performing the duties of this contract, shall and will invest the remaining ninety-seven and one-half per cent. of said interest promptly and without delay in the said stocks before mentioned, and shall and will continue collecting the interest on all the said stock and reinvesting ninety-seven and one-half per cent. of the same so long as said stocks can be purchased by said company at a price not exceeding one hundred and twenty dollars for each one hundred dollars of the said stocks, and in case the price of said stocks rise above said limit the said company shall invest in the public stocks of the United States or in good first bonds and mortgages of real estate until the said Pennsylvania stocks shall fall back to or below said limit, so that the said sum or sums deposited shall accumulate at compound interest until the time shall arrive when the fund accumulated from the said deposits, together with such other sum or sums of money as may be deposited with the said company by others than the said Charles F. McCay for the purpose aforesaid, if any, and the accumulation thereof, shall be equal to the debt at that time owed by the state of Pennsylvania, and the said company further agrees to pay over at that time the said accumulated fund to the Treasurer of the state of Pennsylvania or other officer or agent legally authorized to receive the same, for the purpose of discharging the whole indebtedness of the state and for no other purpose whatsoever; and the said company further agrees to collect the principal of any of the said stocks and other securities and to reinvest the same in the manner before mentioned."

Then follow provisions with reference to the management of the trust, which do not seem to be of importance now, and one other paragraph which may perhaps throw a little further light on the controversy:

"Sixth. And the said company further agree that if the state of Pennsylvania shall at any time hereafter pay the interest due on the said stocks belonging to the said accumulating fund by issuing to the said company new stocks or other obligations in lieu of money to pay the said interest, then, unless this shall be the usual way in which the interest shall at that time be paid by the said state on the remaining portion of the said debt of the said state, this trust and all benefit and advantage to the said state therefrom shall cease and become determined, and the said company shall pay over to the oldest male heir of the said Charles F. McCay then living, his executors,

administrators, or assigns, the whole amount belonging to the said accumulating fund at that time uninvested in the said stocks of the state of Pennsylvania, and also all the amounts they shall hereafter receive from the said state as principal and interest on said stocks, and all stocks of the United States and bonds and mortgages and interest thereon belonging to the said accumulating fund, reserving only to themselves their two and one-half per cent. on all interest received by them, which per cent. is above provided as their compensation for performing the duties of this contract."

Under this agreement McCay paid to the defendant the $377.35 mentioned therein, and afterwards other sums; the whole aggregating $2,000. The accumulation has been so far proceeded with that the defendant, on April 24, 1908, when the pending bill was filed, had in its hands cash and securities amounting to $20,407.24. When the agreement was executed, the debt of the state of Pennsylvania amounted to over $40,000,000; but it has gradually been reduced until on November 30, 1908, the total was only $2,689,617.02. In 1848 the state had not yet established a sinking fund, but this was provided in the following year. And on November 1, 1908, it contained the following assets applicable to the discharge of the state's outstanding debt whenever it should become due, and to no other purpose:

Allegheny Valley Railroad bonds.............................$  100,000 00
Cash in banks............................................... 2,507,179 48
Suspended account, Allegheny National Bank.................     35,351 63
                                                           ------------------
                                                           $2,642,531 11

All these assets are believed by the state to be perfectly good and secured beyond any probability of loss; but they cannot be applied to the payment of the debt until it becomes due, and some of it does not mature until the years 1912 and 1922, respectively. The interest derived from the securities and the cash in the sinking fund has so enlarged that fund since November 30, 1908, that now (say June 10, 1909) it is probably within $12,000 of the outstanding debt, and is larger than the debt if the trust fund in controversy is available by the state.

In considering whether or not the trust created in 1848 was valid, it is to be noted that there is no dispute between the parties about the character of the trust. It is conceded to be a charity, and it is therefore to be regarded from the same point of view as if its object were the building of a hospital or the endowment of a church. But, although the object of the trust is charitable, the trust itself may still be objected to on the ground that it transgresses the rule concerning remoteness, or perpetuity, or accumulation—whichever may be the properly applicable word. (It is plainly a trust for accumulation, and will be so spoken of hereafter.) While charitable trusts, after they have once been determined to be valid, are favorites of the law, the first question must always be: What are the terms of the trust? And the answer must be discovered by applying the ordinary rules of construction to the language that has been employed. After determining the scope of the trust, the further question must also be answered: Is the trust valid? Before attempting to answer these questions, it may be as well to say that section 9 of the Pennsylvania act of April 18, 1853 (P. L. 507), does not attempt to lay down a rule concerning accu-

mulations made, or to be made, under a deed that was executed before the passing of that statute. And although the act of May 9, 1889 (P. L. 173), does declare that "no disposition of property heretofore * * * made for any * * * charitable use shall fail * * * by reason of * * * being given in perpetuity," and directs any court of equity having jurisdiction to carry the intention of the donor into effect, "so far as the same can be ascertained and carried into effect consistently with law or equity," it seems clear that the act (whatever its true meaning may be) cannot be permitted to interfere with such right as the plaintiff may be found to possess. He is either seeking to enforce a resulting trust in favor of his decedent, and in that event the trust came into existence by operation of law as soon as the deed was executed in 1848, or he is representing the rights of the next of kin, and in that event, as the settlor died on March 13, 1889, several weeks before the last-mentioned act was passed, the rights of the next of kin had already vested and could not be disturbed by subsequent legislation. . I do not understand, however, that the defendant's counsel relies upon either of the statutes just referred to, and therefore nothing further need be said about them. Both the plaintiff and the defendant appeal to the rules of the common law to sustain or to overthrow the trust, and to those rules therefore I shall briefly refer.

Confining the discussion to the case of a trust for a charity, it is clear and undisputed that if the gift is vested, if it is present in its terms, is intended to take effect at once, without any intermediate estate, the rule against accumulation does not apply at all. As a charity is for a public purpose, and is intended to be perpetual unless it be expressly limited as to time, there is no reason why indefinite accumulation may not be permitted. But where the gift is contingent, or where it is not intended to vest until the happening of some inevitable future event, this being a condition precedent to the vesting of the beneficial interest, the test of the rule against remoteness is to be applied, and if the contingency, or the happening of the condition precedent, may by possibility be deferred beyond a life or lives in being and 21 years and a fraction thereafter, the limitation is bad under the rule, although the trust be charitable. A resulting trust will immediately arise in favor of the settlor. Coggins' Appeal, 124 Pa. 30, 16 Atl. 579, 10 Am. St. Rep. 565. His purpose is stricken down by the policy of the law—or, rather, it is never allowed to take effect at all—and he may reclaim the fund at once. If he does not thus reclaim it, the mere lapse of time does not affect his right so far as the trustee is concerned, and he may require an account and repayment whenever it may suit his convenience.

This brings me to the point upon which the case must turn, namely, the meaning of the trust agreement. Does it give to the state of Pennsylvania an immediate, vested interest? Or does it give a contingent interest, or an interest which is not to vest until the happening of a future condition precedent? If the interest taken by the state was contingent, or if the vesting was deferred until the accumulated fund should equal the whole debt of the state, the defendant does not deny that there was at least a possibility that the

condition might not happen within the time allowed by the rule against accumulation, and therefore that the rule prevented the trust from taking effect. If, however, the state took a vested interest in 1848, even though the actual enjoyment was deferred, the trust for accumulation was valid, and the complainant has no interest in the fund, either on behalf of the decedent's estate or of the next of kin. In other words, the case depends upon the construction of the agreement, there being no real dispute between the parties concerning the legal principles that should be applied after the meaning of the written instrument has been ascertained. What, then, is the ordinary meaning of the language used by the settlor, and what intention is fairly to be gathered from the words he has used?

As it seems to me, the significant language lies within a narrow compass. The settlor begins with a recital that he has deposited a sum of money and may deposit other sums with the defendant. These sums are not for the present, or the unrestricted, benefit of the state—to which there are no words of present gift—but are "accumulated for the benefit of the state of Pennsylvania *in the way and manner hereinafter mentioned.*" The phrase italicized points forward to what follows almost immediately in paragraph "First," where the "way and manner" of accumulation is defined with precision. The state is to benefit in this particular way and manner, and no other is suggested or implied. I need not repeat the details of the paragraph. The public stock of the state is to be bought under a maximum price, or stock of the United States or bonds and mortgages may be acquired in place of the state's stock, until by the compounding of interest a fund shall be produced. No time is specified when the accumulation is to cease, and none could be specified for obvious reasons. How long it would take to accumulate a fund of the necessary size was beyond the possibility of foresight. In the first place, the settlor contemplated the possibility that his example might be followed by other persons. He refers to "such other sum or sums of money as may be deposited with the said company by others than the said Charles F. McCay for the purpose aforesaid, if any." And in the second place he knew that the state debt would not continue of the same amount as when he executed the agreement, but would either increase or diminish. No one could forecast what might happen in either particular, and he was therefore obliged to leave both of these contingencies to the future. But, however distant or indefinite the time might be, he anticipated the ultimate arrival of a day when a certain condition should come to pass, namely, when upon the one hand the defendant should have in its possession a fund accumulated from deposits made by himself and by such other persons as might share his purpose, and when, upon the other hand, "the debt at that time owed by the state of Pennsylvania" should be equal to the fund.

How distant and indefinite the happening of this event might be will appear more clearly if we take into account another possibility, namely, that the debt might increase more rapidly than the accumulation of the fund, so that the fund would never overtake the total

obligation of the state, or at least would only overtake it after centuries of growth. Numerous and imperative demands might impose continually recurring burdens on the state. Frequent and serious disaster might be suffered by the fund; so that for a period scarcely to be measured from a practical point of view the gap between the fund and the debt might only grow wider. Whether probable or not, this was an undoubted possibility. Moreover, the arrival of the time when one sum should equal the other was made more uncertain by the possible perplexities growing out of the fact that the time named by the settlor was when the accumulated fund should equal the debt "owed" by the state. A debt "owed" might not be a debt due. If the holders of the state's obligations should refuse to receive payment in advance of the time appointed therefor, the interest on their obligations would, of course, go on, and might also be properly regarded as a debt "owed." In such event, was the fund to be applied to the principal merely, or was it to go on accumulating, so as to earn money to pay accruing interest also? I mention these matters to show the uncertainties that surround the whole subject and the difficulty of carrying out the settlor's intention.

For present purposes, however, I shall assume that "the debt at that time owed by the state of Pennsylvania" means the principal of the debt, whether due or not due, and that the psychological moment (if I may use a convenient phrase) contemplated by the settlor would arrive when the accumulated fund should equal the debt thus "owed." Certainly, as it seems to me, not until that moment was the state to derive the slightest benefit from the trust, and if, as conceivably might be the case, the moment (from a practical point of view) should never arrive, the state would never profit by the settlor's elaborate and somewhat fantastic scheme. But, if the moment did arrive, then, and then only, was the trust to be executed; for only at that precise point of time could the direction of the settlor be carried out and the fund be paid to the State Treasurer for the purpose of discharging "the whole indebtedness of the state." Even if no other words were added to this direction, it is plain that the whole indebtedness of the state could not be discharged before that time; for until then, by the necessity of the case, any payment to the state must be a partial payment. But to show beyond the possibility of doubt that a partial payment was not to be permitted, the settlor added the negative words, "and for no other purpose whatever." There is no other subject to which this phrase can be applied than the subject immediately preceding, namely, the discharging of the whole indebtedness of the state, and, as the settlor therefore declared, both affirmatively and negatively, that he intended to discharge the whole indebtedness of the state, and not any part thereof, large or small, it is clear that the fund could not be available for this purpose until it should equal the indebtedness. The settlor had a single definite object in mind. He desired to accomplish this object, and no other, and therefore the state was never to have a beneficial interest in the accumulated fund unless and until the time referred to should arrive. Without prolonging the dis-

cussion, it seems to me to follow inevitably that the interest of the state was either contingent upon the happening of an event which might never happen, or might happen centuries in the future, or (what comes to the same thing) the vesting of the state's interest was deferred until the happening of the same distant and indefinite event. However the matter may be described, I think that no vested interest passed in 1848, and that the interest attempted to be given was of such a character as to violate the rule against perpetuities, or accumulation, or remoteness—if I may use these three terms for the moment, because they have sometimes been employed loosely and interchangeably in the discussion of this subject.

I have not thought it necessary to refer to the cases that have been cited in the briefs of counsel. They have all been considered; but I think it would be superfluous to point out in detail that there is no essential antagonism among them concerning the rules to be applied to a charitable trust. The first problem is always: When does the trust vest? This is a question of construction, and after it has been answered, if the vesting is to take place within the period allowed by law, accumulation may go on thereafter without interruption from the common law. If the vesting cannot take place, or by possibility may not take place, until after the period allowed by law, the trust fails, and it is not saved by the fact that the object was a charity.

Nothing has been said in this opinion about the effect of the sixth paragraph in the trust agreement. Its meaning seems to be this: If, for any reason, the state should issue new stock in order to pay therewith the interest due on the stock already in the trust fund, such action should end the trust at once, unless the interest on the rest of the debt in other hands should be treated in the same way. This seems a most unlikely contingency; but, of course, it might happen, and, if it did happen, the result would be to lengthen somewhat the period of accumulation by increasing the debt of the state. This of itself, however, was apparently not objectionable; for, if the debt were still further increased by paying in stock the interest due to all other debt holders, the settlor seems to have been indifferent to the increase. What he did object to appears to have been a possible inequality of treatment meted out to the stocks in his fund and to the stocks in other hands. What prompted this excess of precaution I do not know; but the paragraph seems to have had this unlikely situation in mind, and to have no special significance in the present controversy. It may, perhaps, be capable of some other meaning; but none has been suggested that gives it great importance.

Neither have I considered what bearing the existence of the sinking fund should have upon the duration of the trust. This is a fund not actually applied to the debt, but set apart in order to be applied when the debt shall accrue. Whether or not it should be treated as a potential payment pro tanto is not material. If the trust never took effect, the matter has no importance. If the trust

is valid, the complainant has no interest in the question, which concerns only the trustee and the state.

A decree may be drawn in accordance with this opinion.